(C. D. 1382)

THE MIDWEST WASTE MATERIAL CO. <br>
E. J. KELLER CO., INC. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 20, 1951)

Barnes, Richardson & Colburn (Eugene F. Blauvelt and Hadley S. King of counsel); Brooks & Brooks (Frederick W. Brooks of counsel), associate counsel, for the plaintiffs.

Charles J. Wagner, Acting Assistant Attorney General, for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; FORD, J., concurring in part and dissenting in part

RAO, Judge: The issue in this case concerns the proper dutiable classification of two importations of certain plain woven burlap strips in various colors, of a width of either 2 or 3 inches and in rolls averaging about 100 yards each. The collector of customs at the port of New York classified said merchandise pursuant to the provisions of paragraph 1008 of the Tariff Act of 1930, as woven fabrics, wholly of jute, dyed, and accordingly assessed duty thereon at the rate of 1 cent per pound and 10 per centum ad valorem. The two separate protests filed against that decision of the collector, which protests were consolidated for the purposes of this trial, claimed alternatively that the merchandise is dutiable at only 7½ per centum ad valorem as waste, not specially provided for, by virtue of paragraph 1555 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, or that it is free of duty as paper stock under paragraph 1750 of said act. In addition, it was further claimed in protest 153952–K that the merchandise is free of duty as waste bagging, which is provided for in paragraph 1617 of said act.

As to the last-alleged basis for recovery herein, although trial counsel for plaintiffs specifically asserted that he did not abandon it, he also advised the court that he was not relying upon it. He did not, in fact, adduce any evidence at the trial, nor argument in his brief, tending to show upon what theory paragraph 1617 of the Tariff Act of 1930 could be here invoked. As will hereinafter appear, the evidence affirmatively establishes that the merchandise at bar is not waste bagging. Accordingly, the claim for classification under said paragraph 1617 is overruled.

The tariff provisions pertinent to this proceeding read as follows:

PAR. 1008. Woven fabrics, wholly of jute, not specially provided for, not bleached, printed, stenciled, painted, dyed, colored, or rendered noninflammable, 1 cent per pound; bleached, printed, stenciled, painted, dyed, colored, or rendered noninflammable, 1 cent per pound and 10 per centum ad valorem.

PAR. 1555. Waste, not specially provided for, 10 per centum ad valorem. [The rate provided for in said paragraph 1555 was reduced to 7½ per centum ad valorem in the trade agreement with the United Kingdom, *supra.*]

PAR. 1750. Rag pulp; paper stock, crude, of every description, including all grasses, fibers, rags, waste (including jute, hemp, and flax waste), shavings, clippings, old paper, rope ends, waste rope, and waste bagging, and all other waste not specially provided for, including old gunny cloth, and old gunny bags, used chiefly for paper making, and no longer suitable for bags.

Samples cut from the imported rolls of woven burlap, conceded to be representative of the 2- and 3-inch strips, respectively, were received in evidence as plaintiffs' exhibits 1 and 2. Except for the variation in width, and the fact that exhibit 1 is of a green color, while exhibit 2 is black, there is otherwise very little difference between the two samples. Apparently, and this seems not to be a matter of dispute between the parties, the merchandise of which said exhibits are representative was originally designed for use by the armed forces of the United States in the garnishing of nets for camouflage purposes. Specifications for the composition and pattern of camouflage nets, issued by the United States Army and the National Military Establishment, are in evidence as defendant's collective exhibit A.

It further appears that the imported camouflage strips, and many hundreds of thousands of pounds of similar domestic and foreign merchandise, had never been devoted to the use for which they were produced, and that they were sold abroad and in this country, during the years 1945 to 1948, to civilian consumers, presumably as surplus war material. There is some evidence in the record to the effect that the armed forces are still using burlap strips in the making of camouflage nets, but it was not clearly established whether in this endeavor the surplus from the Second World War is utilized or new merchandise is being produced. In any event, it may fairly be stated that none of the civilian purchasers of this material employed it for the purpose of making camouflage nets.

It is the contention of the plaintiffs in this case that the merchandise at bar could not properly be classified as woven fabrics of jute, for the reason that, in its imported condition, it had no commercial use as a fabric; that it was a surplus or waste material used solely for its fiber content, either as paper stock in the manufacture of paper, or as material for the making of jute felt, and is therefore provided for in paragraph 1555, *supra*, as modified, as waste, not specially provided for. In this connection, counsel for plaintiffs rely upon the judicial definition of the word "waste" contained in the cases of *Harley Co.* v.

*United States*, 14 Ct. Cust. Appls. 112, T. D. 41644, and *United States* v. *C. J. Tower & Sons*, 31 C. C. P. A. (Customs) 185, C. A. D. 271. In the alternative, the claim is made that the instant merchandise, though not known to trade and commerce in 1930, was of the class or kind of material which at that time was chiefly used for paper stock, and hence that it is free of duty by virtue of the provisions of paragraph 1750, *supra*.

The position of the Government in this case is that the imported camouflage strips in rolls of 100 yards in length and 2 or 3 inches in width, which came into existence originally in 1943 by order and specification of the United States for use in camouflage nets, are still devoted to that use, and chiefly so used; and that such merchandise as found its way into the open or commercial market in the years 1945 through 1947 as surplus war material was suitable for and used for other than waste purposes. Accordingly, it is urged that the merchandise was properly classified under paragraph 1008, *supra*, as woven fabrics, wholly of jute, dyed.

The record in this case is a substantial one. Eleven witnesses were called to testify on behalf of the plaintiffs; two testified in behalf of the defendant; and the parties stipulated into the record the evidence which would have been elicited from a 14th witness had he appeared and testified.

The first two witnesses called by plaintiffs, namely, the broker who made the entry for The Midwest Waste Material Co., and a commercial photographer who took various pictures of the importation of that company as it lay on pier 20, Staten Island, merely identified the importation and revealed, through a booklet of 13 photographs taken at the pier and received in evidence as plaintiffs' exhibit 3, how it looked upon arrival in this country. These show the merchandise to have been imported in bags, bales, and in openwork or net-like containers with apparent disregard for the care or preservation of the material. In some instances, the merchandise appears to have broken out of the packing, and to have become unrolled and considerably tangled.

Of the remaining nine witnesses for the plaintiffs, four were dealers in waste materials, four were connected with firms engaged in the manufacture of roofing materials, including roofing felt, a kind of paper used in the manufacture of shingles, and one was employed by a concern which manufactures jute felt pads used as under-rug cushions and for automobile upholstery.

Typical of the dealers in waste materials was Edward J. Keller, president of plaintiff E. J. Keller Co., Inc., who had been in the business of importing paper-making materials and some spinning materials since 1915. He testified that he had personally made the purchase of the merchandise imported by his company; that he had first seen such merchandise when he made a purchase of some of it

from Egypt, although the Egyptian material, unlike the instant merchandise which was in rolls of approximately 100 yards each, arrived in pieces packed in large bales; that he also made one or two purchases of the same material from The Midwest Waste Material Co.; that all of the camouflage strips bought by his company were sold to the Riegel Paper Co., a manufacturer of paper of all kinds; that, before that company purchased the merchandise from him, it tested samples in its laboratory and found that the color readily disappeared and did not affect its use in paper making; and that, in processing the material, the Riegel Paper Co. first put it through cutters to macerate it into smaller pieces, then into washers and beaters where it was refined and shortened into fibers.

Mr. Keller stated further that in his 44 years in business he had known and dealt in a class of jute waste material used for paper making which was known variously according to quality as new burlap cuttings, heavy burlaps, and lightweight burlaps. Some of these were of the same character as exhibits 1 and 2, some varied, depending on the source from which they were obtained, some varied in color. As representative of new burlap cuttings, the witness produced and there were received in evidence, as plaintiffs' collective exhibit 4, nine pieces of natural burlap fabric of assorted sizes, which, the witness said, were smaller than most burlap cuttings because they were samples which had been forwarded to him by air mail. In explanation of the origin of burlap cuttings, he stated that when new burlap is manufactured into bags, floor-covering bales, covering for bedding, and many other articles, pieces varying considerably in size, shape, texture, cleanliness, and color, are clipped off as waste. According to this witness, plaintiffs' exhibits 1 and 2 are known as burlap strips, collective exhibit 4, as burlap cuttings and strips; and throughout his business experience the major use he had known for burlap cuttings such as collective exhibit 4 and for merchandise such as exhibits 1 and 2, in rolls of 100 yards each, was for paper making, and he knows of no other use.

The witness also testified that he first became familiar with burlap strips in about 1946, when they were made available as surplus from the armed forces; that prior to 1946, he had never seen camouflage strips in 100-yard rolls used in the making of paper; and that burlap cuttings such as plaintiffs' collective exhibit 4 were never received in rolls.

Upon being questioned by the court, the witness stated that he had seen merchandise such as collective exhibit 4 and exhibits 1 and 2 used as paper-making material; but that, if the merchandise is in long strips like exhibits 1 and 2, it is a disadvantage for the mill because it is necessary to unravel the rolls and cut them, which means extra labor; whereas scrap such as collective exhibit 4 is put right

through the cutters and is a very fast process. He also testified that collective exhibit 4 is the waste in the manufacture of bagging, while merchandise like exhibits 1 and 2 was surplus war material to be used on nets for camouflaging guns. He thought that the imported merchandise had not been used prior to importation, as it was in the original rolls; that it had lost its availability for its original purpose because of exposure, primitive methods of storing, and damage to the rolls. He admitted that burlap cuttings are more ready for use in paper making than burlap strips.

Another dealer in waste materials called to testify for plaintiffs was Harry B. Korman, president of plaintiff The Midwest Waste Material Co., who had personally been in the waste material business since 1932. He stated that the merchandise here involved, imported by his company, was probably sold to Allen Industries, Inc., who is a user of scrap bagging and jute strips, such as exhibits 1 and 2 and collective exhibit 4; and that the bulk of his importations went to Allen Industries, Inc., although at least one sale was made to the Keller Co. and shipped on its instructions to the Riegel Paper Co. He testified further that he had visited one or another of the plants of Allen Industries, Inc., on an average of once a week and had observed what was done with the material purchased from his company. As a whole, the firm shredded this stock and reduced it to fibers, from which it made jute felt pads to be used underneath automobile mats. About 75 to 85 per centum of the stripping was used for this purpose. The balance was utilized without shredding as an innerliner or weight factor for the pads.

On cross-examination, the witness Korman testified that he sold Allen Industries, Inc., anywhere from 1,200 to 10,000 tons of burlap stripping; that the condition of the rolls did not determine whether the material was used for shredding or for weighting; and that material like collective exhibit 4 could not be used for weighting or reinforcements because it was too small.

Marvin Schapiro, also a dealer in waste materials, testified that he was vice president of S. Schapiro & Sons, Inc., and had been employed by that company or connected with it since about 1933 or 1934. He stated that he had purchased approximately 10 million pounds of merchandise like exhibits 1 and 2 from the Reconstruction Finance Corp., and had sold at least two-thirds of it to firms engaged in the business of paper making, although he had no personal knowledge that the merchandise was actually used by such firms for that purpose.

James T. Flannery, a partner in the firm of James T. Flannery Co., dealer in waste materials, testified that he had been in that business for 31 years; that he is also the treasurer of the National Association of Waste Material Dealers; that he sold one lot of domestic strips of the same material as exhibits 1 and 2, and as agent of the firm of

I. & J. Hyman of London, sold considerable tonnage of the imported material to The Midwest Waste Material Co. He stated that he sold merchandise like exhibits 1 and 2 as paper stock "because in our trade, surplus materials of that nature, if we are going to dispose of them, must be classified as some type of scrap bagging"; that he would classify such material as number 1 scrap bagging; that he has sold merchandise like collective exhibit 4 for 30 years, under the name of new burlap cuttings; that he has always sold it to paper mills as paper stock. When asked whether exhibits 1 and 2 fall into the same category as collective exhibit 4, he answered "not the same category; the same type of material. This [plaintiffs' collective exhibit 4] is a burlap cutting and this [plaintiffs' exhibits 1 and 2] I would classify as a scrap burlap." He then said that collective exhibit 4 would be classified as new material, new burlap cuttings, and exhibits 1 and 2 as "Number 1 Scrap material." Based on his experience, the only uses he knew of for exhibits 1, 2, and collective exhibit 4 were for paper making or for shredding, with paper making the major use of not only material such as these exhibits but for any kind of jute.

On cross-examination, he stated that exhibits 1 and 2 came in rolls, but he had never seen merchandise like collective exhibit 4 in rolls; that if he were buying burlap strips such as exhibits 1 and 2, he would use them for paper making, but that he did not know to what use they were actually put; and that if the strips were shredded, they could be used for purposes other than paper.

On the subject of the use of merchandise of the type here involved in the making of roofing felt, plaintiffs first called Boris Petricoff, who testified that he is the president of Leshner Corp., a firm which deals in and consumes waste materials and also engages in direct mill buying; that this company had been in existence only 3 years, but prior thereto, and for a period of 23 years, he was employed by the Philip Carey Corp., a manufacturer of felt and roofing products; that he was in charge of all the buying and selling for one of the divisions of that company; that, in 1946, he purchased material such as exhibits 1 and 2 which was handled as number 3 roofing rags; that number 3 roofing rags is a name applied in the roofing felt trade to anything that is made from jute; and that such rags are first put through cutters, then through beaters, where they are torn apart and reduced to fibers, and then made into paper. The witness was unable to state the actual tonnage of such material used by his firm because it was mixed with other so-called number 3 roofing rags before being processed, but was of opinion that it actually purchased close to 100 tons of exhibit 1 material, as well as some number 3 roofing rags which contained burlap strips mixed in with other products. He also

testified that number 3 roofing rags is a category he has known all his business life; that, while his company may have purchased material like exhibits 1 and 2 as camouflage strips, it classified the same as number 3 roofing rags; that the fact that material like exhibits 1 and 2 came in rolls, presented a problem in cutting, but that that problem was solved; that merchandise like exhibits 1 and 2 is surplus material; that he has also handled merchandise like collective exhibit 4; that in his experience the only use either type of merchandise has is for paper making or shredding, and that he knows of no other commercial use in its present condition.

Raymond J. Berry, also called as a witness on behalf of the plaintiffs, testified that he is the manager of the waste paper rag division of B. F. Nelson Manufacturing Co., a concern which manufactures paperboard products and roofing materials, including roofing felts. He stated that he had been in that business with this and other companies since 1931; that he is familiar with the material represented by exhibits 1 and 2 which is commonly classified as number 3 roofing rags; that he purchased such material for his company; that it was used as number 3 roofing rags in the manufacture of dry felt paper by being put through a cutter and converted back to the original fiber; and that the only use he knew for exhibits 1 and 2 and collective exhibit 4 was as number 3 roofing rags to be manufactured into paper. It was his opinion that any jute product is a number 3 roofing rag in the roofing industry. As his line was roofing, he knew of no other use to which exhibits 1 and 2 might be put commercially.

Carl J. Nolte, director of purchases for the Globe Roofing Products Co., testified that his company is engaged in the business of manufacturing roofing paper—shingles and roofing; that he has been with that company for 2½ years; that prior thereto and for a period of 31 years, he was district purchasing agent for Barrett Allied Chemical & Dye Corp. which also produces roofing felts and paper; that he first began to purchase raw materials for that company in 1923 and was continuously so engaged until 1948; that during the years 1945 to 1948, he purchased material such as exhibits 1 and 2 for his company, either as burlap strips or as number 3 roofing; that such material was used by his company in the making of roofing felt; that he did not personally know of any other use for exhibits 1 and 2; that he has been familiar with merchandise like collective exhibit 4 since 1923 and has purchased it as number 3 roofing for the making of roofing felt; that material like exhibits 1 and 2 was used for the same purpose; that exhibits 1 and 2 were received in rolls; and that he had no records to show what quantity of material, such as exhibits 1 and 2, was used by his firm because, when it was received at the plant, it was thrown in with scrap bagging burlap strips and classified with all other such material as number 3 roofing rags.

Theodore Henvick, a buyer of raw materials for Ruberoid Co., called to testify on behalf of plaintiffs, stated that the Ruberoid Co. manufactures building materials, including roofing felts; that he has been with that company since 1933, at all times directly concerned with purchases of waste materials for it; that, during 1946 and 1947, he purchased material like exhibits 1 and 2, either as number 3 roofing rags, or, and less frequently, as jute in rolls; that his records would not indicate the quantities purchased under any category because it was always described in the company's receiving reports as number 3 roofing rags; that he is also familiar with material like plaintiffs' collective exhibit 4, and has always bought such material as number 3 roofing rags; and that whether of exhibit 1 type or exhibit 4 type, all such raw material was used in the manufacture of roofing felt, after it was first reduced to fiber.

With respect to the use of merchandise such as plaintiffs' exhibits 1 and 2 in the manufacture of jute felt, plaintiffs called Allen R. Kahn, an employee of Allen Industries, Inc., a very large consumer of that material. He testified that he was in control of raw materials for the Rahway, N. J., plant of that company; that he had been employed by Allen Industries, Inc., in various capacities for a period of 16 years, mostly in charge of raw materials; that his company started using merchandise of the type of plaintiffs' exhibits 1 and 2 in 1946 and 1947; that the majority of that material was first reduced to its original fiber by shredding, then garnetted, and put through a needle loom, and that the resulting product is jute felt which is used for rug pads and in the automobile trade; that some of the material, not more than 10 per centum thereof, was used, without being shredded, as an inter-liner between two batts of jute; that this material was used for that purpose because of a shortage of new burlap or tobacco cloth which was normally used; that the strips were not satisfactory for that purpose because the handling of them could not be controlled; and that, when new burlap or tobacco cloth again became available, the camouflage strips were used only for shredding; that he could not estimate the total poundage of merchandise like exhibits 1 and 2 used by Allen Industries, Inc., but that it was a "tremendous amount"; that he did not think that 75 per centum of the burlap strips could be used for inner lining "Because of the way that they were handled in transportation when they arrived in this country. They were all loose, torn, and in order to use them as an inner liner, the original roll would have to be in very good condition in order to feed it into the machine"; and that if the roll was not in good condition, it had to be shredded.

A more accurate and detailed description of the use of the instant material is contained in the testimony of Morey L. Abrahams, secretary-treasurer and member of the Policy Committee and of the Board

of Directors of Allen Industries, Inc., which the parties stipulated and which we here produce in part:

\* \* \* that the jute felt pads manufactured by Allen Industries, Inc., are used as under-rug cushions, mattress pads, and automobile upholstery pads; that Allen Industries, Inc., maintains plants at Plymouth, Michigan, St. Louis, Missouri, Rahway, New Jersey, and Detroit, Michigan; that he is familiar with the burlap strips, Plaintiff's Exhibits 1 and 2 and Defendant's Exhibit B, which he classifies as old bagging waste; that in the years 1946 and 1947, he purchased upwards of twenty million pounds of such material in rolls of approximately 100 yards each; that his material was either shredded into fibers and made into jute felt by means of Garnett machines and needle looms or was run into the center of the jute fibers, as they passed through the Garnett machines, directly from the rolls without shredding or cutting. In the latter case, the burlap strips were not sewed or fastened together and were pulled into the center of the mass of jute fibers by the action of the Garnett machines without any control as to spacing or pattern and running only lengthwise of the strip of the finished jute felt; that the jute felt is manufactured and sold upon the basis of its weight per square yard; that a weight loss of approximately 15 per cent was sustained when the burlap strips were shredded into fibers while no weight loss occurred when the burlap strips were run into the fibers without shredding and that the sole purpose of running the unshredded burlap strips into the jute fibers was to bring the weight per square yard of the jute felt up to the desired standard and that, therefore, the number of individual strips run into any given width of jute felt varied with the weight per square yard of the finished felt; that sometimes two or three burlap strips overlay each other in the midst of the jute fibers while at other times, the burlap strips lay in a single layer at irregular and uncontrolled intervals; that the company no longer uses burlap strips such as Exhibits 1 and 2 and B and that when such burlap strips were used in the manner already described, it was only because of an acute shortage of old bagging waste during the years 1946 and 1947; that it is the witness' recollection that the greater proportion of the burlap strips used by Allen Industries, Inc., was run into the midst of the shredded jute fibers directly from the rolls in the whole piece without shredding but that he is unable, at this time, to recall what the exact proportion was; that it is the witness' recollection that 75 per cent of the burlap rolls received by Allen Industries, Inc., were in good condition and suitable for feeding into the midst of the shredded jute fibers in the whole piece but that 75 per cent of the strips were not so used and that a part of the 75 per cent suitable for use in the whole piece were nevertheless shredded into fiber form; that it is the witness' recollection that approximately 10 per cent of the twenty million pounds of burlap strip purchased by Allen Industries, Inc., was consigned for use in the Rahway, New Jersey plant; that none of the burlap strip material in question purchased and used by Allen Industries, Inc., was used in the making of any kind of paper.

For the defendant, John Andryscak testified that he is a civilian employee of the United States Army Corps of Engineers; that his title is supervisor of inspectors; that his duties include the inspection of material; that he is familiar with merchandise like exhibits 1 and 2, which was used by the Army for the purpose of garnishing nets to simulate buildings; that it was purchased and used by the United States Army continuously since 1942; that the Army uses this as camouflage material at the present time; that it was ordered to specifications which are contained in defendant's collective exhibit* A;

that said exhibit also specifies the net and all its component parts; and that the use to which material like exhibits 1 and 2 was put by the Army was camouflage, and he knows of no other use. This witness was not able to state, however, whether exhibits 1 and 2 meet with the Army specifications, nor whether the Army is presently purchasing or is willing to purchase camouflage burlap strips representing surplus from the last war.

Josephine R. Keogh was also called as a witness on behalf of defendant. She testified that she is the secretary of O'Brien Products, Inc., a firm which buys and sells waste materials, including jute fabrics; that O'Brien Products, Inc., purchased as surplus from the War Assets Administration material similar to plaintiffs' exhibits 1 and 2 in rolls of 100 yards, weighing approximately 3 pounds per roll. A sample roll of the material purchased by her firm was received in evidence as defendant's exhibit B. The witness stated further that the records of her business, defendant's collective exhibit C, indicate that it purchased 850,596 rolls or a total of 2,551,788 pounds, some of which her subsidiary, Sisal Products Co., a manufacturer of sisal pads, used as backing in the making of sisal pads, to strengthen them; that the balance of the material was sold at a profit to several other companies; that sisal pads, such as defendant's exhibit D, are used in the manufacture of mattresses and chair seats; that exhibit D is the finished sisal pad; that about 20 strips, taken from exhibit B, were placed across the back of the pad, spaced at intervals of about 2 inches; that the strips are punched on to the sisal pad by means of a needle loom; that exhibit D was produced without a burlap backing as the firm no longer had any of the strips when it was made; and that the burlap strip was used for backing and for no other purpose.

We have deemed it necessary to review at length the testimony of the various witnesses called by the respective parties for the reason that the issues raised herein are primarily matters of fact. Of course, in the first instance, the question of what constitutes a waste, for tariff purposes, is one of law, which must be resolved independently of the facts. But the purely legal query into the common meaning of the term "waste" has been the subject of frequent judicial expression, and requires no new interpretation here.

In the case of *Harley Co.* v. *United States, supra,* the court stated:

In the tariff sense, waste is a term which includes manufactured articles which have become useless for the original purpose for which they were made and fit only for remanufacture into something else. It also includes refuse, surplus, and useless stuff resulting from manufacture or from manufacturing processes and commercially unfit, without remanufacture, for the purposes for which the original material was suitable and from which material such refuse, surplus, or unsought residuum was derived. The latter class of waste might be appropriately designated as new waste and includes such things as tangled spun thread, coal dust, broken or spoiled castings fit only for remanufacture. T. D. 33376; *Willets*

v. *United States,* 11 Ct. Cust. Appls. 499, 500, 501; *Schlesinger* v. *Beard,* 120 U. S. 264; *Seeberger* v. *Castro,* 153 U. S. 32; *Patton* v. *United States,* 159 U. S. 500, 505, 509; *Latimer* v. *United States,* 223 U. S. 501–503.

The recent case of *United States* v. *C. J. Tower & Sons, supra,* further defines a waste in the following manner:

As appears from the quoted statement in the *Harley Co.* case, *supra,* there are two kinds of waste; namely, one, a manufactured article which, because of use or otherwise, has become useless for the purpose for which it was designed and is fit only for remanufacture; and, two, so-called "new waste," which is refuse material resulting from a manufacturing process and which is commercially unfit without remanufacture for the purpose for which the original material was suitable.

However, whether a given article of merchandise falls within these legal concepts depends in great measure upon the facts surrounding its production, its use or condition prior to importation, and its commercial suitability for its originally intended purpose. It cannot be denied that the merchandise at bar, by virtue of its having been woven from jute fibers, is a woven fabric wholly of jute. Nevertheless, the propriety of its classification under the statutory provision for such woven fabrics is not thereby necessarily established. If, in its imported condition, the merchandise has no commercial fitness as a textile, or is not chiefly used as such, it is not, in a tariff sense, a fabric. *McGettrick et al.* v. *United States,* 11 Ct. Cust. Appls. 64, T. D. 38727.

We think the great weight of the evidence in this case supports the proposition that the chief, if not the sole, use of the instant merchandise and merchandise of like kind and condition, in the commerce of the United States, was, at the time of importation, as a material, as distinguished from its use as a fabric. Seven witnesses for the plaintiffs testified that several thousand tons of this material were used in paper making. Two witnesses for the plaintiffs attested to the use of very large quantities of this material for its fiber content in the manufacture of jute felt pads. The stipulated testimony of the secretary-treasurer of Allen Industries, Inc., confirmed the use of 10,000 tons for this latter purpose. All of plaintiffs' witnesses, expressly or by implication, negated the proposition that the fabric quality of the instant merchandise possessed any commercial utility in the United States.

Nor can it be said that the evidence produced by the defendant substantially minimizes the effect of this testimony. We cannot attach much weight to the testimony of the witness Andryscak, for the reason that it is fairly obvious from the evidence which he gave that he had not seen merchandise of the class or kind of that here involved, in its condition as imported. Although he stated on direct examination that he was familiar with the material of plaintiffs' exhibits 1 and 2, which was *originally* ordered to specifications and

used by the Army to garnish nets for camouflage purposes, he later admitted that he was not in a position to state whether the Army is *presently* purchasing or is willing to purchase camouflage burlap strips representing surplus from the last war. His testimony on cross-examination, which we here quote, confirms our conclusion that this witness had no knowledge whatsoever concerning the use of burlap stripping sold as surplus material.

X Q. Collective Exhibit A are specifications issued by the United States Army for the manufacture of camouflage nets and nettings, is that correct?— A. That's correct, sir.

X Q. And, includes specifications for the component parts of those nets?— A. That's correct.

X Q. You don't know, do you, whether Exhibits 1 and 2 that you have there before you meet with the Army's specifications do you?—A. No.

X Q. You mean that once they did but now they don't?—A. That could be so, yes, sir.

X Q. All the camouflage strip material sold by the United States Government after the war was sold as surplus material, I take it, was it not?—A. I wouldn't know that, sir.

X Q. Do you know that any was sold?—A. I don't know that either.

X Q. Do you know that any is being purchased?—A. Yes, sir.

With respect to the witness Keogh, there are several inconsistencies in her testimony which have not been reconciled. Although she stated that portions of the burlap strips were used by her subsidiary corporation as a backing in the making of sisal pads, by being stitched along the reverse side of the pad, at 2-inch intervals, the sample produced by her as a finished sisal pad contained no burlap backing. It would seem that, if it were a usual practice of the manufacturer to put a backing on all sisal pads, either the camouflage strips or some substitute therefor would appear on the sample she submitted. Moreover, she was not clear in her statement as to whether the pad was completed before the strips were attached or whether the process of manufacture of the pad and the attached backing was a simultaneous one. It is not inconceivable that the burlap strips were used, not in the manner which the witness described, but, as in the case of the jute felt pads manufactured by Allen Industries, Inc., to bolster the weight of the article. Some significance also attaches to the fact that the witness' company sold a substantial portion of the 2½-odd million pounds of camouflage strips to concerns other than its subsidiary, and that no explanation of the use made of that material by those purchasers was offered.

At best, and disregarding these seeming discrepancies, the testimony of this witness establishes merely that an unspecified portion of the 2½ million pounds of material purchased by her company was actually utilized as a textile. While such evidence may suffice to rebut that portion of the proof tending to indicate that the merchandise was

*never* used as a fabric, it is totally insufficient to establish that its *chief* use was not, as here claimed and shown, for other than textile purposes.

In view of the foregoing, it is clear that the merchandise represented by exhibits 1 and 2 and B is, in fact and in contemplation of law, a waste such as is provided for in paragraph 1555 of the Tariff Act of 1930. It fits precisely within the confines of the definition of waste contained in the *Harley* case, *supra*, as a surplus manufactured article which has become useless for the original purpose for which it was made and is fit only for remanufacture into something else. As to whether it is that kind of waste which is designated in paragraph 1750, as paper stock, the evidence is neither clear nor convincing, and we hold that plaintiffs have not sustained the burden of proof on that issue.

The provision in paragraph 1750, *supra*, for paper stock is an *eo nomine* designation by use, the common meaning of which is to be determined as of the effective date of the Tariff Act of 1930. In the cases of *Hawley & Letzerich et al.* v. *United States*, 19 C. C. P. A. (Customs) 47, T. D. 44893, and *United States* v. *Belgam Corp. et al.*, 22 C. C. P. A. (Customs) 402, T. D. 47402, the term "paper stock" was construed to mean that class of material which, on and prior to June 17, 1930, was chiefly used in the making of paper. Since, however, the instant merchandise was not known to trade and commerce in the United States on that date, plaintiffs necessarily were required to show that merchandise such as is represented by plaintiffs' exhibits 1 and 2 belonged to that class or kind of material which was, as of June 17, 1930, chiefly used as paper stock or, if such proof was not available by reason of the new character of the instant commodity, that merchandise of that type was, at the time of importation, chiefly used in the making of paper. *W. J. Green* v. *United States*, 8 Cust. Ct. 173, C. D. 599.

In view of the concession of counsel for the plaintiffs in their brief that plaintiffs were unable to prove chief use at the time of importation, we need not here consider the second alternative approach available to plaintiffs.

The contention that the merchandise in controversy is of the same character as certain other jute materials which were chiefly used for paper making in 1930 rests upon an alleged similarity between plaintiffs' exhibits 1 and 2, taken from the importation, and plaintiffs' collective exhibit 4, several pieces of burlap clippings or cuttings, which as heretofore noted were representative of the waste materials resulting from the manufacture of burlap bags and other articles made from jute fabrics, and were stated to be chiefly used for paper making continuously from June 17, 1930, to the present. That the quality of the woven substance contained in each of these exhibits is sub-

stantially the same is evident from a mere examination of those exhibits. That the condition in which the separate articles represented by these exhibits were received by the paper makers differed to a substantial degree is likewise apparent from the testimony that material like exhibits 1 and 2 was in rolls approximately 100 yards in length, whereas burlap cuttings like collective exhibit 4 were invariably in small pieces, rarely if ever more than two feet square. On the effect of this difference, we note the following testimony of the witness Keller:

JUDGE LAWRENCE: Mr. Keller, in the conduct of your business, have you seen merchandise such as Exhibit 4 treated as paper making material?

THE WITNESS: I have very often.

JUDGE LAWRENCE: And, have you seen merchandise such as Exhibits 1 and 2 so used?

THE WITNESS: Yes.

JUDGE LAWRENCE: Is it important to the paper manufacturer whether the merchandise is in small pieces like Exhibit 4 or in long strips like Exhibits 1 and 2?

THE WITNESS: If the material is in strips, it is a disadvantage for the mill because they have to unravel those rolls and cut them; it means extra labor; whereas, the scrap like this they put right from the cutters and it is a very fast process.

\* \* \* \* \* \* \*

By MR. WAGNER:

X Q. Mr. Keller, so that I may understand your testimony, you stated that the burlap cuttings included in Collective Exhibit 4 are more susceptible of use for paper making than the burlap strips, Exhibits 1 and 2?—A. Well, they prefer them because they have less labor in putting through the cutting.

X Q. I say they are more susceptible for use.—A. More ready for use, yes.

Similarly, the witness Petricoff acknowledged that his mill hands were having difficulty cutting the rolls of burlap strips; that "they were having fits because the rolls were representing new problems to them and they were having a problem cutting it."

Material which requires extra labor, additional treatment, or a new technique of processing is not, insofar as this record is concerned, of the same character as material which can be readily handled without such extra labor, additional treatment, or new technique of processing, even though the ultimate use of the material be the same.

Moreover, it is observed that the witness Flannery was not willing to state that exhibits 1 and 2 fall into the same category as collective exhibit 4. Calling exhibits 1 and 2 scrap burlap, and collective exhibit 4 burlap cuttings, a new material, he said they were the same type of material but not the same category. He stated further that "For sales purposes, 1 and 2 would have to be classified in my opinion as Number 1 Scrap material," and collective exhibit 4 "as new burlap cuttings."

As for those witnesses engaged in the manufacture of roofing felts, it is apparent that they had no knowledge of the use of jute waste in

any other industries and that to them any jute material was number 3 roofing rags. We have, for example, Petricoff's statement that "what we call number 3 roofing rags represent anything that is made from jute." It cannot fairly be said that such vague and general testimony sets up any category of jute materials to which we can refer as constituting a class of jute waste chiefly used for paper making when the Tariff Act of 1930 became a law. Neither do we think that plaintiffs have sufficiently proven that the merchandise at bar was of a class or kind of materials which as of June 17, 1930, was known as paper stock. Something more must be shown than that the merchandise was susceptible of the same ultimate use, and that indefinite quantities of the material were so used, which, in effect, is all that the instant record contains.

Upon the foregoing considerations, the claim in the protests that the merchandise at bar is waste, not specially provided for, dutiable at the rate of 7½ per centum ad valorem, pursuant to the provisions of paragraph 1555 of the Tariff Act of 1930, as modified by the trade agreement with the United Kingdom, *supra*, is sustained. All other claims in the protests are, however, overruled.

Judgment will be entered accordingly.

OPINION CONCURRING IN PART AND DISSENTING IN PART

FORD, Judge: I concur in the conclusion reached by my associates that plaintiffs have failed to establish that the involved merchandise is properly classifiable as paper stock under paragraph 1750 of the Tariff Act of 1930. I am, however, unable to agree with the majority that plaintiffs have established that the merchandise is waste, not specially provided for, within the meaning of that term in paragraph 1555 of said act, for reasons which will presently be stated.

The majority opinion contains the following statement:

* * * If, in its imported condition, the merchandise has no commercial fitness as a textile, or is not chiefly used as such, it is not, in a tariff sense, a fabric. *McGettrick et al.* v. *United States*, 11 Ct. Cust. Appls. 64, T. D. 38727.

While it is doubtful that the *McGettrick* case could be construed as supporting the above holding of the majority in a proper case, yet, if it be so accepted, it is my view that the *McGettrick* case has no application here for the reason that the evidence herein fails to bring the instant merchandise within the pronouncements therein made.

The collector's classification of the instant merchandise carries with it the presumption that he found all the facts necessary to support it. *Vandiver* v. *United States*, 14 Treas. Dec. 376, T. D. 28521; *Cresca Co.* v. *United States*, 15 Ct. Cust. Appls. 105, T. D. 42185; *United States* v. *Hawley & Letzerich*, 15 Ct. Cust. Appls. 107, T. D. 42186. The collector classified the involved merchandise as woven fabrics, wholly of jute, not specially provided for, dyed. There are two

samples of the involved merchandise in evidence herein and they are potent witnesses in favor of the collector's classification. An examination of these samples is convincing that the involved merchandise is a fabric. The fact that an importer of fabrics may find it more expedient to use such fabric for other than a fabric purpose or use cannot serve to change its proper classification. It is admitted that the involved merchandise is wholly of jute and that it is dyed. This is all that is necessary to sustain the collector's classification. It is my view that the contrary of this has not been established by the plaintiffs' evidence.

It is not disputed that the instant merchandise was originally designed and produced for use by the armed forces of the United States in the garnishing of nets for camouflage purposes. With reference to the use of this merchandise by the United States Army from the date it was first produced in 1942 until the date of the trial of this case, John Andryscak, a civilian employee of the United States Army Corps of Engineers, holding the position of supervisor of inspectors, testified as follows:

Q. Now, was that purchased and used by the United States Army continuously from 1942?—A. It was.

\* \* \* \* \* \* \*

Q. Do you know, Mr. Andryscak, whether the Army used this as camouflage material and continues to use it as camouflage material at this time?—A. Yes, sir.

Q. And was that ordered to specifications by the Army originally?—A. Yes, sir.

Q. And is still being used as such?—A. Yes, sir.

In my opinion, this testimony is not weakened by the fact the witness stated that he did not know whether the merchandise met the Army's specifications which are issued by the United States Army today for the manufacture of camouflage nets and nettings; that he did not know whether all the camouflage strip material was sold by the Army as surplus material; and he did not know that any was sold. As supervisor of inspectors, this witness was not in a position to answer the above questions as to the sale of the involved merchandise as surplus. The question of whether or not this merchandise was sold as surplus and whether the witness knew that any was sold is immaterial to this case.

The presumption is that if this merchandise had not met the Army's specifications, the Army would not have purchased it in the first instance. There is in evidence only one set of specifications for the manufacture of this merchandise. If these specifications had been changed, it was the burden of the plaintiffs to show this as a fact. This they failed to do. Furthermore, the collector's classification carries with it the presumption that the involved merchandise

in its imported condition was suitable for use, and was in fact used, as a fabric for camouflage purposes; that it was reasonably available for the use for which it was originally manufactured; that it could be repaired without undue expense and devoted to its original purpose, or that without remanufacture it had a valuable practical use. The contrary of this has not, in my opinion, been established by the plaintiffs.

If merchandise which was originally designed for use by the armed forces of the United States in the garnishing of nets for camouflage purposes has been purchased and used by the United States Army as camouflage material from 1942 until the date of the trial of this case, how then can it be said that the merchandise has become useless for the original purpose for which it was manufactured, and is fit only for remanufacture into something else?

The majority opinion appears to assume that because this merchandise was no longer needed by the United States Army, and was sold as surplus, it *ipso facto* became useless for the original purpose for which it was produced and was fit only for remanufacture into something else. In this I feel that my associates have fallen into error. The testimony set out above establishes, in my opinion, that this merchandise has not become useless for the purpose for which originally produced and that it is fit only for remanufacture into something else, and renders inapplicable here the holding in the *Harley* case, *supra*, on the question of whether or not the involved merchandise is a fabric.

Only one of plaintiffs' witnesses stated, in response to a question by the court, that in his opinion, the merchandise had lost its availability for its original purpose. In view of the fact that this witness was engaged in the business of importing paper-making materials, and showed no other qualifications for the statement, it is my view that his statement is not entitled to sufficient weight to overcome the presumption of correctness in favor of the collector's classification. This statement is contradicted by the testimony of witness Andryscak, who was in a better position to know whether the merchandise was suitable for the use for which originally intended.

Aside from the statement of plaintiffs' one witness that the merchandise had lost its availability for its original purpose, the record is barren of any evidence that the involved merchandise was not reasonably fit for the purpose for which it was originally intended and was not practically available for such use, or that it did not have a value in addition to that of mere material, or that it could not be repaired without undue expense and devoted to its original purpose. There is testimony, however, that the merchandise did have, without remanufacture, a valuable practical use. In view of the foregoing, it is my opinion, that the following quotation from the *Harley* case, *supra*,

relied upon by my associates, precludes the classification of this merchandise as waste:

\* \* \* Of course, if a manufactured article is reasonably fit for the purpose for which it was originally intended and is practically available for such use, or has a value in addition to that of a mere material, it is not old junk. So wearing apparel which is still reasonably available for use as wearing apparel, or which may be repaired without undue expense and devoted to its original purpose, or which, without remanufacture, has a valuable practical use, is not waste or old junk. *Carberry* v. *United States,* 116 Fed. 773; *Downing* v. *United States,* 122 Fed. 445, 446, 447; *Ginsburg & Sons* v. *United States,* 147 Fed. 531, 532; *Ill. Cent. Ry. Co.* v. *McCarl,* 147 Fed. 925; *Dwight* v. *Merit,* 140 U. S. 213.

Paragraph 1008 of the Tariff Act of 1930, under which the merchandise was classified, provides for woven fabrics, wholly of jute, not specially provided for, dyed. I find nothing in this provision which suggests that the construction thereof is governed by the rule of use or chief use.

While I readily concede that the use of the involved merchandise in paper making is not a textile use, yet merchandise which has a commercial fitness for and is used or chiefly used in the manufacture of jute felt is a textile, and, under the majority ruling, this would make the involved merchandise a fabric.

Giving to the importers the most favorable view possible of this record, the most that can be said in their favor is that some of the involved merchandise might be slightly damaged. When this merchandise was originally manufactured it was woven fabrics wholly of jute, dyed. Certainly, the slight damage, if any, which the record shows this merchandise might have suffered is not sufficient to change its classification from that of woven fabrics wholly of jute, dyed, to that of waste, not specially provided for.

It is my view that the present record is insufficient to overcome the presumption of correctness attending the collector's classification and establish the claim of the plaintiffs as waste, not specially provided for, under paragraph 1555 of the Tariff Act of 1930. I would therefore overrule all claims of the plaintiffs in the two protests herein.