(C.D. 2404)

D. M. STUDNER v. UNITED STATES

United States Customs Court, Second Division

(Decided June 20, 1963)

*Siegel, Mandell & Davidson* (*David Serko* and *Allan H. Kamnitz* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Upon importation from Denmark, certain articles, covered by consumption entry 760456, were classified by the collector of customs as print rollers, with raised patterns of brass or brass and felt, used for printing designs, in paragraph 395 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 395), as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, and duty was imposed thereon at the rate of $5 each, plus 57 per centum ad valorem.

The claim relied upon by plaintiff is contained in an amendment of his protest, wherein it is alleged that said merchandise should properly have been classified as waste, not specially provided for, in paragraph 1555 of said act (19 U.S.C. § 1001, par. 1555), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, which provides for a duty assessment of 4 per centum ad valorem.

The provisions of the tariff act in competition herein are here set forth.

Paragraph 395 of the Tariff Act of 1930, as modified by the sixth protocol, *supra:*

Print rollers, of whatever material composed, with raised patterns of brass or brass and felt, finished or unfinished, used for printing, stamping, or cutting designs_____ $5 each and 57% ad val.

Paragraph 1555 of said act, as modified by the Torquay protocol, *supra:*

Waste, not specially provided for_____ 4% ad val.

In addition to the testimony of four witnesses for the plaintiff and three for the defendant, specific reference to which will be made, *infra*, the following exhibits were received in evidence:

Plaintiff's exhibit 1 and defendant's exhibit A are print rollers representative of the merchandise in issue.

Plaintiff's illustrative exhibit 2 is a print roller similar to exhibit 1, except that both bearings have been removed whereas only one bearing has been removed from exhibit 1. Said exhibit 2 was the subject of decision in *Pelton Enterprises, Inc., and Hoyt, Shepston & Sciaroni* v. *United States*, 44 Cust. Ct. 381, Abstract 63935.

Plaintiff's exhibit 3 consists of a commercial invoice attached to consumption entry 760456 covering the instant importation.

Plaintiff's exhibit 4 is an advertisement illustrative of one of the methods by which the articles in issue are marketed.

Consumption entry 760456, which includes the merchandise presently in issue, covers 4 cases containing a total of 512 print rollers. A commercial invoice accompanying said entry, in evidence as plaintiff's exhibit 3, discloses that the print rollers contained in one of said cases were manipulated while in customs' custody, the manipulation consisting of the removal of part of the design. From notations on said invoice, it appears that the manipulated print rollers, with part of the design removed, were no longer considered suitable for use as print rollers, and classification of this portion of the importation, covered by consumption entry 760456, was made within the purview of articles, not specially provided for, composed in chief value of brass, in paragraph 397 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 397), as modified by the sixth protocol, *supra*, for which duty at the rate of 20 per centum ad valorem is provided.

The first witness to testify in this case was David M. Studner, importer of the instant merchandise and plaintiff herein. He testified to his familiarity with the merchandise covered by consumption entry 760456, which he described as 4 cases of brass lamp bases, a total of 512 bases, and that exhibit 1 is representative of the importation.

The imported merchandise, according to Studner, was purchased

from a firm called Fiona Wallpaper, in Faaborg, Denmark, a company engaged in the business of printing and manufacturing wallpapers. The witness explained that, on a visit to the Fiona factory abroad, he personally selected the rollers by having them exhibited individually before him. The instant rollers had been kept in a storage place abroad. His basis of selection was whether the print rollers were of a design suitable for lamps. As to the physical condition of the rollers at the time of his examination and prior to purchase, the witness stated that they were covered with the dust of many years and, in some instances, were damaged, some of the edges had rotted away, and most of them were cracked, but as long as the designs were suitable for lamp base purposes, Studner accepted them.

This witness explained that, after purchase of the rollers and prior to their importation into this country by specific instructions of the importer, one bearing was removed from each of the rollers and a square piece of wood affixed in its place to serve the twofold purpose of protection and as a base. Subsequently, the statement was made by Studner that the main purpose for removing the bearing and attaching the piece of wood was to obtain the benefit of a lower rate of duty upon importation.

Prior to shipment to this country, a piece of wallpaper was wrapped around the individual rollers, and the rollers were packed in cases of from 105 to 146 rollers in each of 4 cases.

After examining exhibit 1, Studner testified that there were parts of the design thereon which were missing and that was the condition in which the merchandise was imported.

All of the print rollers covered by the instant importation were sold to one firm, the Mario Manufacturing Co., a manufacturer of lamps. Subsequent to the instant importation, Studner had purchased many thousands of rollers and has continued to sell them to Mario Manufacturing Co. and, in addition, has sold them under his own name as a mail-order proposition through a magazine advertisement (exhibit 4). None of the rollers comprising the instant importation or the subsequent importations referred to was used for the printing of wallpaper.

John Pedisich, vice president of the Ronkonkomo Wallpaper Corp., was called to testify as plaintiff's second witness. Pedisich stated that he has been in the wallpaper manufacturing business since 1931. The Ronkonkomo Wallpaper Corp., a small plant, is a member of the Wallpaper Institute, and Pedisich is a director of said institute and previously had served as its treasurer and president. The Wallpaper Institute is a manufacturers' association and carries on the regular functions of a trade association in setting standards and disseminating information among its members. As an arm of the institute, the

Wallpaper Council was created to promote and publicize the wallpaper industry throughout the country.

Pedisich has delivered lectures at the College of the City of New York and in the States of Connecticut, Arkansas, Virginia, and New Jersey on the subject of wallpaper manufacture. He has traveled throughout the United States and is familiar with the manufacture of wallpaper in all parts of the country. The manufacture of wallpaper is limited to comparatively few mills, at the most 30, all rather small and most of them using the same type of machinery and equipment.

Upon being asked to describe briefly the steps that go into the making of wallpaper by the printing method, the witness stated that, in order to build a line and to have something to offer, a wallpaper producer would go to an artist or to a design studio either with or without an idea for a wallpaper design. When a design has been selected, it is sent to a block cutter. The design is transferred to print rollers, and the print cutters must separate the colors in the design. If there are four or five colors, the print cutter must separate them so that they will be put on different blocks. A sketch of the design is made and transferred to each of the rollers. The reason for this is to have each roller cut to the exact size, because when the rollers are put into the printing machines, the rollers print almost simultaneously, one after the other, and if there would be a variance in the size of a roll, there would be a "misfit, or lack of register."

Pedisich was asked to examine plaintiff's exhibit 1 and, in answer to a question, stated that said exhibit could not, in its present condition, be used to print wallpaper. When asked his reasons, he stated that there is a flange missing, pieces of the design itself are missing, but, most important, it is only one of a set. In order to print the entire design for which exhibit 1 was originally made, all of the rollers necessary to print that design are required.

It was Pedisich's testimony that it is not a common practice to purchase used wallpaper rollers. In the industry, the witness stated, wallpaper manufacturers have enough trouble finding designs that are marketable without buying another manufacturer's castoffs.

When a wallpaper from certain rollers no longer sells or warrants reprinting, the rollers themselves are obsolete, because they have no further value to the manufacturer. When asked what is done with obsolete rollers, the witness stated that it depends on the availability of storage space and other factors. If one feels that the styles might change and the design might be of value, a manufacturer would put the rollers away for possible reuse. If the design was a "fad," the rollers would be disposed of either by burning or offering the metal for sale as scrap. The actual condition of the rollers has no bearing on whether they are obsolete. Pedisich stated that the cost of a set of

rollers, depending upon the amount of cutting in the design, might vary from as little as $200 to as much as $2,000 for a set of rollers. When new rollers are shipped, the witness explained that each roller would be wrapped in protective corrugated paper, placed in a carton, and transported individually.

On being asked to compare exhibit 2 with exhibit 1, Pedisich stated that exhibit 2 is worn down and does not have as interesting a design as exhibit 1, and he doubted whether exhibit 2 could be used for printing, since the brass had been worn down so close to the wood.

Pedisich stated defendant's exhibit A (which is of a larger diameter than plaintiff's exhibit 1 and is part of a set of matching rollers) could be placed on a Waldron printing machine, provided special gears were fitted to it. The witness stated that exhibit A could be repaired by the replacement of the pins, which are missing, and that the head could be replaced. The same steps could be taken as to exhibit 1, and the print roller could be used to print wallpaper, if one had the rest of the set. Neither exhibit 1 nor exhibit A could be used for its original purpose in its imported condition.

Plaintiff's third witness was Alan M. Limburg, president and sole owner of the Old Stone Mill Corp., which manufactures and sells wallpapers made by the printing method. Limburg was qualified to testify and his testimony was, for the most part, corroborative of that given by plaintiff's previous witnesses. In answer to a question by the bench, Limburg stated that, based on his knowledge, experience, and observation, exhibit 1, in the condition as imported, is not of a type, kind, or class which would be commercially practicable and economical to be used for printing wallpaper and that he did not know of anybody in the business who had ever bought old print rollers and used them in their own line. His statement to this effect was predicated on 15 years' experience and a knowledge of most of the wallpaper manufacturers in this country.

Vito M. Russo was the fourth witness to testify for plaintiff. He stated he is president of the Mario Manufacturing Co., manufacturer of lamps and shades, and that he had been with the firm since 1935.

Counsel for the respective parties orally stipulated that all of the rollers covered by the entry in question, with the exception of two of the exhibits herein (exhibit 1 and exhibit A), were actually made into lamps by the Mario Manufacturing Co., and that the articles were then sold as lamps.

Russo testified that when the 510 rollers were received at his plant, he found that some of the designs were falling out and many of the rollers were split down the middle. His company was able to repair some of them with plastic wood or plaster, and he was given credit by the importer-plaintiff for a number of them that could not be repaired and used as lamp bases.

Harry G. Meredith was the defendant's first witness. He had been a manufacturer of print rollers for 30 years and, prior thereto, served an apprenticeship. Wood rollers with brass design of the kind represented by the exhibits illustrative of the instant importation are the only kind of rollers he manufactures. He has also repaired rollers of this type—whole sets, single rollers, or sometimes two out of a set. In explanation of the repair work performed on rollers, the witness stated, in some cases, the brass is taken out and replaced with new. In some instances, brass is added to change the pattern slightly. The fact that there are hairline cracks on exhibit 1 would not matter as long as the brass surface was true.

Meredith stated that he had made print rollers for a one-roller design many times and that he has made or repaired rollers which are known as background rollers. A background roller is one to produce a design underneath the whole pattern. If you have a floral pattern, a background roller could be used to put a particular background underneath the main pattern.

After examining exhibit 1, the witness stated it could very easily be used as a background roller by putting in a few pieces in the center, which would take about 35 minutes' time, placing a head on the roller, and regrinding it. He has changed many rollers to background rollers in the manner just described. He stated that exhibit A could also be used as a background roller and that it would take about 5 minutes to replace a couple of missing pins thereon, affix a head to it, and to polish it.

On cross-examination, Meredith testified that the print rollers he manufactures are always made to a design specified by the end user. He stated also that he repairs print rollers at the request of wallpaper manufacturers who send damaged print rollers to him for repair and that he never buys old rollers to fix them up for purposes of resale.

After examining the exhibits in this case, the witness stated that, in the condition as imported, they could not be used for printing purposes, but would have to be subjected to minor repairs.

Defendant's second witness was Peter Schepis, a color mixer with the Mueller Co. of Brooklyn. As part of his duties, he had to decide whether print rollers should be sent out for repairs.

When asked, on cross-examination, if, in the condition the representative exhibits are at the present time, they could be used for printing wallpaper, the witness answered in the negative.

Rudolph Boehle, the owner of a print cutting business, was the third witness for the defendant. For the last year or so, 98 per centum of his business has been obtained from wallpaper manufacturers and was concerned with the making of printing cylinders to print wallpaper. Prior thereto, his company made print rollers for textile printing, which rollers are similar in size and application. His company also

repairs rollers, and he added that he has been so engaged for about 20 years.

Boehle testified that he had seen the Waldron type printing machine in operation and had observed rollers being fitted to said machines. He stated that a Waldron machine will take a roller of any size from 12 inches up to 24 inches in circumference. Such rollers could be used on a Waldron machine with gears of the proper size.

Exhibit 1 and exhibit A could not be used in their present condition for printing wallpaper. After examining plaintiff's exhibit 1, he stated that it is part of a set of rollers and that exhibit A appears to be one of a set of two rollers. Boehle testified he had made new rollers for $50 or $60 and that sometimes a roller might cost $450; that there is no established minimum price; and that the charge varies according to the labor involved. In answer to a question by the bench, the witness stated a new roller like exhibit 1 would cost approximately $150, and one like exhibit A would cost about $50.

The testimony of Boehle concluded with the statement that, regardless whether or not exhibits 1 and A may have been part of a set, if they were repaired in the manner previously described, they could be used for printing wallpaper.

The evidence offered by plaintiff has overcome the presumption of correctness of the collector's decision, which is the first of the two burdens imposed upon a plaintiff in classification litigation. *United States* v. *Loffredo Bros., Gehrig Hoban & Co., Inc.*, 46 CCPA 63, C.A.D. 697.

That being so, it is an open question as to what is the proper classification of the articles in issue in their condition at the time of importation, for that is the test to be applied. *Michaelian & Kohlberg, Inc.* v. *United States*, 22 CCPA 551, T.D. 47554.

Plaintiff, in his brief, sets out four considerations calling for classification of the instant print rollers as waste, within paragraph 1555 of the tariff act. We here set them forth:

1. Print rollers become obsolete for the purpose for which originally intended once the design, which they print, has become obsolete;

2. The imported print rollers, by virtue of their price, physical condition when imported, and failure to be imported in complete sets, have absolutely no use in the printing of wallpaper;

3. All of the witnesses, both plaintiff's and defendant's, agree that there is no market in the United States for used print rollers, such as the imported merchandise, in the wallpaper industry. The only market is for the remanufacture of the obsolete print rollers into lamps and similar articles.

4. All of the imported articles, with the exception of the two exhibits in evidence (1 and A), were sold to a lamp manufacturer who, in fact, used the articles to make lamps.

From the evidence contained in the testimonial record, we learn that rollers for printing wallpaper come in sets of rollers of a number

equal to the various colors contained in a particular wallpaper design. The imported merchandise was not imported in such sets, but as a miscellaneous collection of more than 500 obsolete rollers.

The record also discloses that obsolescence in the wallpaper industry is not predicated on the condition of print rollers, but on their marketability. When a wallpaper loses its appeal as an article of commerce, the print rollers which give it its design, regardless of their condition, are obsolete. Said rollers are either stored for possible return to favor of the obsolete design at some future indefinite time or sold as metal scrap or for other purposes—in the present instance, lamp bases.

There is also evidence of record which discloses that the imported articles, despite their worn and intentionally incomplete condition, due to the removal of one of the bearings and the attachment of a wooden base, may, at a nominal cost and in a matter of hours, be restored to such a condition that they may be used for printing purposes. Evidence is lacking, however, to show that such an article is a marketable item. To the contrary, the record discloses that there is no market for single rollers of a set, whether obsolete or not, and, furthermore, that wallpaper manufacturers do not purchase other manufacturers' castoffs for the obvious reason that if a wallpaper design is lacking in public appeal, it matters not who produces it.

There is some testimony to the effect that single print rollers of a set, similar to the exhibits before the court, may, after being repaired and possible additions made to the design, be used as background rollers. The record on this point is considered to be weak. Moreover, as heretofore observed, it is the condition of the article as imported which controls its classification.

Various cases cited in the briefs of the parties have been given our consideration. Both counsel make reference in their briefs to the case of *Pelton Enterprises, Inc., and Hoyt, Shepston & Sciaroni* v. *United States*, 44 Cust. Ct. 381, Abstract 63935, wherein certain obsolete print rollers, which were classified, as in the instant case, in paragraph 395 of the Tariff Act of 1930, as modified, were held to be waste, not specially provided for, in paragraph 1555 of said act, as modified, as is also the claim of the plaintiff herein. Defendant, in its brief, endeavors to minimize the effect of the *Pelton* case on the ground that, in said case, the plaintiffs' testimony stood unrebutted and no brief was filed by the Government, both of which circumstances do not exist in the present case. Despite those differences, the court is here of the opinion that the rationale of the *Pelton* case aptly applies to the record before us.

It was stated in the *Pelton* case, *supra*, that—

The term "waste" for tariff purposes has been the subject of frequent judicial expression. In the case of *Harley Co.* v. *United States*, 14 Ct. Cust. Appls. 112, T.D. 41644, the court stated:

*In the tariff sense, waste is a term which includes manufactured articles which have become useless for the original purpose for which they were made and fit only for remanufacture into something else.* It also includes refuse, surplus, and useless stuff resulting from manufacture or from manufacturing processes and commercially unfit, without remanufacture, for the purposes for which the original material was suitable and from which material such refuse, surplus, or unsought residuum was derived. The latter class of waste might be appropriately designated as new waste and includes such things as tangled spun thread, coal dust, broken or spoiled castings fit only for re-manufacture. T.D. 33376; *Willets* v. *United States*, 11 Ct. Cust. Appls. 499, 500, 501; *Schlesinger* v. *Beard*, 120 U.S. 264; *Seeberger* v. *Castro*, 153 U.S. 32; *Patton* v. *United States*, 159 U.S. 500, 505, 509; *Latimer* v. *United States*, 223 U.S. 501–503. [Italics supplied.]

Subsequently, in the case of *United States* v. *C. J. Tower & Sons*, 31 C.C.P.A. (Customs) 185, C.A.D. 271, the court, in citing the *Harley* case, *supra*, made the following observation:

As appears from the quoted statement in the *Harley Co.* case, *supra*, there are two kinds of waste; namely, one, a manufactured article which, because of use or otherwise, has become useless for the purpose for which it was designed and is fit only for remanufacture; and, two, so-called "new waste," which is refuse material resulting from a manufacturing process and which is commercially unfit without remanufacture for the purpose for which the original material was suitable.

The above cases were cited with approval in a more recent decision of this court in the case of *The Midwest Waste Material Co.* and *E. J. Keller Co., Inc.* v. *United States*, 28 Cust. Ct. 8, C.D. 1382.

It is the opinion of the court, in the instant case, that, as in the *Pelton* case, *supra*, the print rollers here in issue are "manufactured articles which have become useless for the original purpose for which they were made and fit only for remanufacture into something else" and, therefore, constitute waste in the tariff sense, as claimed by plaintiff.

We, accordingly, hold that the items of merchandise covered by consumption entry 760456, which were classified by the collector of customs as print rollers, with raised patterns of brass or brass and felt, used for printing designs, in paragraph 395 of the Tariff Act of 1930, as modified, *supra*, and subjected to duty at the rate of $5 each, plus 57 per centum ad valorem, should properly have been classified as waste, not specifically provided for, in paragraph 1555 of said act, as modified, *supra*, and assessed with duty at the rate of 4 per centum ad valorem, is sustained. As to all other claims and all other merchandise, the protest is overruled.

Judgment will issue accordingly.