(C.D. 2638)

C. J. Tower & Sons of Buffalo, Inc. v. United States

United States Customs Court, Second Division

(Decided March 28, 1966)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* and *Earl R. Lidstrom* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Herbert L. Warren* and *Arthur H. Steinberg*, trial attorneys), for the defendant.

### Before Rao and Ford, Judges

Ford, Judge: This case involves the question of the propriety of classification of certain merchandise, as "plied nylon yarn, having over 20 turns twist per inch, weighing per length of 450 meters over 150 deniers, valued under 90 cents per pound," under the provision of paragraph 1301 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and the assessment of duty thereon at the rate of 47½ cents per pound.

Plaintiff contends that said merchandise is properly dutiable at 5 per centum ad valorem as waste of rayon or other synthetic textiles under the provisions of paragraph 1302 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802. By oral amendment, plaintiff alternatively claims said merchandise is properly classifiable as waste, not specially provided for, under the provisions of paragraph 1555 of the Tariff Act of 1930, as modified by said Torquay protocol, *supra*, and as such dutiable at the rate of 4 per centum ad valorem.

The pertinent portions of the provisions involved herein read as follows:

Paragraph 1301 of the Tariff Act of 1930, as modified by T.D. 52739, *supra:*

Yarns of rayon or other synthetic textile, not specially provided for:

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

 Plied, weighing per length of 450 meters—
  150 deniers or more_____ 25% ad val., but not less than 25¢ per lb.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

 Any of the foregoing yarns if having over
 20 turns twist per inch_____ The respective rate specified above and 22½¢ per lb. in addition, but not less than the respective minimum rate specified above plus 22½¢ per lb.

Paragraph 1302 of the Tariff Act of 1930, as modified by T.D. 51802, *supra:*

Waste of rayon or other synthetic textile, except waste
 wholly or in chief value of cellulose acetate_____ 5% ad val.

Paragraph 1555 of the Tariff Act of 1930, as modified by T.D. 52739, *supra:*

Waste, not specially provided for_____ 4% ad val.

The record herein consists of the testimony of three witnesses called on behalf of plaintiff as well as an illustrative exhibit of the imported merchandise received in evidence as plaintiff's illustrative exhibit 1. The defendant offered the testimony of three witnesses as well as offering six exhibits on its behalf.

The first witness called on behalf of plaintiff was J. B. Scythes, president and general manager of the exporting firm. Mr. Scythes testified that he is familiar with the imported merchandise having personally sold it to the importer; that such merchandise was produced by Goodyear Cotton Co., Ltd., and that plaintiff's illustrative exhibit 1 fairly represented the merchandise involved herein; that he has seen the filaments twisted and put on to a cone in the Goodyear plant; that he sold the merchandise as waste yarn containing knots, oil spots, and drop ply, not guaranteed for quality. At this point, plaintiff offered the commercial invoices and all other papers transmitted by the collector of customs to the Customs Court. The

attorney representing the defendant objected to the receipt in evidence of the commercial invoices on the ground that they contain self-serving statements and are hearsay insofar as they describe the merchandise. The trial judge, nevertheless, received the papers in evidence without marking them. For reasons which become apparent, the admission of these papers is immaterial to the finding of this court.

The witness then testified that the description of "knots" would indicate that there is more than one piece of continuous yarn since, if there was a break, it would have to be knotted to join the pieces; that oil spots are evident in the sample; that drop ply is when one of the plies breaks and the yarn continues for a single end until the operator picks it up again to become two plies; that, while he has not bought or sold merchandise such as exhibit 1 in the United States, the difference between exhibit 1 and merchandise which does not contain the defects is that of value; that the difference in value is roughly 3½ to 1, i.e., 30 cents for merchandise such as exhibit 1 and about $1 for new yarn; that new nylon filament yarn is used in the manufacture of tire fabric and merchandise such as exhibit 1 is used for making lamp fringe, cores for sash-type woven articles, fishlines, and nylon knitted nets.

The next witness called on behalf of plaintiff was Mr. John D. Turcotte, superintendent of the textile division of the Goodyear Tire & Rubber Co., Ltd., which was formerly known as Goodyear Cotton Co., Ltd. The witness testified that the business of this company is to make cord fabric; that he has witnessed the production of the tire fabric many times a day; that to produce this fabric they purchase a single yarn which is given a twist and then plied; that the plied yarn is then put on a cable twister to twist the two ends of the single yarn into 840 denier two-ply nylon cord; that it is then taken to the weaving department which makes a fabric about 60 inches wide; that this fabric is known as tire cord fabric; that they also make other fabrics for industrial belts; that the tire cord fabric differs in that the cord will have 12 turns per inch whereas in the belt fabric the cord may have only 4 turns per inch; that he is familiar with merchandise such as exhibit 1, which in his opinion is a waste product and is never used for tires by his company; that exhibit 1 has soiled yarn and some slack twist; that the soiled yarn does not meet their specifications as it creates a poor adhesion since the rubber will not adhere to the soiled yarn; that overply occurs when you have one end that breaks and slides on the next end of the machine and, therefore, you have three plies instead of two; that this is objectionable because the gauge is too thick and, when you put rubber on it, there is a differential in the twist; that the lower twist cannot be used either since it has not enough twist in it and causes the ends to break; that

underply means that it does not have enough ply and is, therefore, objectionable since it can cause a weakness in the tire; that the merchandise utilized for tires is put on a spool whereas exhibit 1 is put on a cone; that the reason a spool is used for tire cord fabric operation is that it would be too expensive to put tire cord fabric on a cone since this necessitates an extra operation.

On cross-examination, Mr. Turcotte testified that exhibit 1 is a filament yarn; that it is not used by his company for making industrial belts and he did not know whether other companies used it for that purpose; that the oily spots in exhibit 1 are usually caused in the last operation when an end breaks and piles up in a pallet and the ends fly around and travel around a ring which is greasy and a separator which is greasy, and the merchandise then picks up oil or grease; that the knots occur in the manufacturing process if an end breaks and it is tied together.

Mr. Robert R. Cleveland, assistant to the director of textile production of Goodyear Tire & Rubber Co. of Akron, Ohio, was next called on behalf of plaintiff. The witness testified that he has been in all phases of management of the textile mills and has had daily occasion to see the manufacture of tires by Goodyear as well as the manufacture of the other products of that company; that he is familiar with merchandise such as exhibit 1, which is due to equipment problems, and that his company has never knowingly put merchandise such as exhibit 1 into a tire cord fabric, because grease or oil stains will result in adhesion failure, since gum or rubber will not stick to grease or oil-contaminated material; that the first quality product used in the manufacture of tires would first be processed to tension, heat, and the adding of an adhesive solution to the tire cord fabric; that the fabric would then move from that stage to the calender where it would be coated with gum; that it would then go to the bias cutters which make it into bands and then to the tire building operation; that underply would not be used because it would result in weak spots since you only have one or two plies depending upon the number of plies you are putting into a tire; that an overply would likewise result in a different physical characteristic of the cord at the point of overply, in that the cord would have a different elongation and the strength could be affected depending upon the change in twist where the overply occurred; that merchandise such as exhibit 1 is sold through waste brokers and that the companies to which the merchandise is shipped make venetian blind cords, fishlines, and it is used for a number of other purposes such as lamp fringe; that his characterization of the merchandise is simply "waste" as far as the tire manufacturers are concerned; that the primary purpose for an article such as exhibit 1 which did not contain any

of the defects would be for the production of tire cord fabric and exhibit 1 is not fit for that purpose.

On cross-examination, the witness testified that merchandise such as exhibit 1 might be used by his company for tying cord.

An official sample was received in evidence as defendant's exhibit A. Exhibit B for identification was withdrawn.

Defendant called on its behalf Robert Agee, superintendent of the Chemstrand Co. tire making and testing facilities. The witness testified that he had held that position for 6 years and that, prior thereto, he was with Firestone Tire & Rubber Co. for 16 years; that his duties with the Chemstrand Co. include the evaluation of their products, one of which is nylon tire yarn and that, in this connection, he has become familiar with the product, such as plaintiff's exhibit 1, which he characterized as an off-quality tire yarn cord; that he would not consider it waste since each company has its own standards; that exhibit 1 is a tire cord yarn whereas a tire fabric is one roughly 60 inches wide; that a nylon tire cord is a twisted structure made from continuous filament yarn cabled into a cable and twisted; that exhibit 1 is a yarn; that plaintiff's illustrative exhibit 1 and defendant's exhibit A are usable for tires in their condition as imported, although not for first line tires; that tires utilizing such merchandise usually have the material interspersed with first-quality material; that oil spots do degrade adhesion but, when utilized with grade one material, the spots would be dispersed through the fabric; that there are tires which do not undergo extreme abuse, such as industrial tires, small tires, wheelbarrow tires, and small tractor tires; that merchandise such as exhibit 1, based upon his own experience, is used in the same manner as first-quality merchandise; that no further manufacturing is required; that exhibit 1 is a standard yarn package but is not a standard cord package which utilizes a twister spool; that exhibit 1 is wound from a twister spool to the cone; that the yarn on a cone such as exhibit 1 is not any different from the yarn on spools; that it is put on a cone by rewinding when it is off-quality material; that knots do not necessarily make the product unusable because you have to tie ends together to make a continuous length of cord; that he would not put exhibit 1 in a first line tire, which is one intended for use at high rates of speed of 60 miles per hour and up; that, in addition to the tires mentioned before, bicycle tires would also utilize merchandise such as exhibit 1; that exhibit 1 has gone through the same manufacturing process as first-quality nylon cord yarn, plus one additional step of twisting it back to a cone which does not change the yarn; that there are knots in first-quality nylon yarn.

Mr. H. Carlton Robinson was next called on behalf of defendant. Mr. Robinson testified that he is president of Johnston & Co. Cable

Cord, Inc., and has been with the firm since 1932. The witness testified that the business of this firm is acting as distributors, selling agents, and manufacturers of twines, yarns, cordage, and kindred products; that he is familiar with merchandise such as exhibit 1 and has bought and sold such merchandise in considerable quantities; that merchandise such as exhibit 1 and exhibit A is not considered by him to be waste but defective or second tire cord yarn; that it is not waste because it is usable for many purposes in its present stage without being processed in any manner; that he is familiar with nylon tire cord yarn waste, a sample of which was offered and received in evidence as defendant's exhibit C; that merchandise such as exhibit C is not usable in its present condition; that exhibit C was purchased from B. F. Goodrich; exhibit D, the invoice for the merchandise received in evidence as defendant's exhibit C, was received in evidence; that exhibit C is the only kind of nylon cord yarn waste; that there are other types of nylon from suitings and shirtings; that merchandise such as exhibit C considered by him to be waste, and he felt this was the opinion of the trade and commerce of the United States since, in addition to Goodyear Rubber Co., he is also talking as a result of his experience with Deering Milliken and Firestone; that, in his opinion, exhibit 1 is not waste since it is usable and has actually been used for repairing gill nets and seine nets; that exhibit 1 can be used in its condition as imported and can be woven into end products to make window rope, braid, ripcords, cables, braided hose, and garden hose, just to name a few.

The witness testified that, in his opinion, material that is usable in the imported condition such as exhibit 1 without being further processed is not waste. This is based upon the fact that it will serve the same purpose as the merchandise which is considered first quality. The witness further testified that, when he purchases the waste material, it comes in bales and never on cones; that exhibits 1 and A are weavable in their condition as imported and can be braided; that exhibits 1 and A are ply yarns.

The defendant called as its last witness, Mr. Esau Levin, who testified that he was the owner of Levin Marine Supply which manufactures nylon nets and cordage; that he has been in the business approximately 28 years; that he has manufactured nylon nets exclusively from merchandise identical to exhibit 1 and exhibit A, which he purchased from Bibb Manufacturing, Deering Milliken, Firestone, Goodrich, and some other companies and brokers; that it is known in the trade as nylon tire cord yarn and not as waste; that he has used this merchandise for the last 10 years in amounts running from 1,500 to 1,800 pounds a week on his braiding machines; that he had utilized first-

quality merchandise and used it for the same purpose utilizing the same manufacturing process in the production of his nets and other products; that he was familiar with merchandise such as exhibit C which was the result of what was left of exhibit 1 after his braiding operation; that he sold such merchandise as waste; that the nylon nets made by his company are used by fish trawlers in the New England area and that he had sold nets in New York, New Jersey, and Virginia; that fish nets were made by first rewinding merchandise such as exhibit A on a 4-inch winding bobbin similar to an article such as defendant's exhibit E; that 16 of these spools were put on a Wardwell braiding machine and then a braid such as exhibit F was made; that the braid was then put on a net tying machine and made into a mesh, such as defendant's exhibit G; that he was not concerned with oil spots or knots in the manufacturing of his product and that there was no difference in the strength due to the oil, the drop ply, or the overply; that there was no difference in the nets whether manufactured from first-quality or second-quality cord yarn nor in the manufacturing process itself.

On cross-examination, Mr. Levin testified that the term "waste" is something that has to be reprocessed to be usable again.

It has been established by the instant record that the imported merchandise consists of cones of nylon yarn weighing 840 deniers, having two plys and which contain oil spots, overply, drop or underply, undertwist or overtwist. Whether it responds to the term "yarn," as used in paragraph 1301, *supra*, or by reason of the stated imperfections has lost its character as "yarn" and becomes "waste" is the question which must here be determined. It is well settled that tariff terms are presumed to be used by Congress in accordance with their commercial meaning, which meaning is also presumed to be the common meaning. *Nylos Trading Company* v. *United States*, 37 CCPA 71, C.A.D. 422. In the absence of a showing of a commercial designation which differs from the common meaning, the latter controls. Common meaning is a matter of law to be determined by the court. As an aid in its determination, the court may consider dictionaries and other lexicographic authorities. *United States* v. *O. Brager-Larsen*, 36 CCPA 1, C.A.D. 388, *United States* v. *Tropical Craft Corp., etc.*, 42 CCPA 223, C.A.D. 598.

It is equally well established that the common meaning of a term once judicially determined will be presumed to continue in use until the statutory language is changed by subsequent legislation. *United States* v. *Pacific Butchers Supply Co.*, 22 CCPA 355, T.D. 47377.

The common meaning of the term "yarn," as provided for in paragraph 1301 of the Tariff Act of 1930, as modified, *supra*, was judicially determined in the case of *Geo. H. McFadden & Bros., Inc.* v. *United*

*States*, 50 Cust. Ct. 133, C.D. 2401, as was the common meaning of "waste of rayon or other synthetic textile" as provided for under paragraph 1302 of said act, as modified, *supra*, determined in *A. L. Erlanger Co., Inc.* v. *United States*, 35 Cust. Ct. 189, C.D. 1742; *Dolliff & McGrath* v. *United States*, 40 Cust. Ct. 560, Abstract 61961; *Alintex, Inc., et al.* v. *United States*, 54 Cust. Ct. 111, C.D. 2517. A reading of the provisions of paragraph 1302 involved herein establishes that it is identical to the language considered in the *Erlanger*, *Dolliff & McGrath*, and *Alintex* cases, *supra*. Hence, there has been no change of language. The provision for yarns under paragraph 1301 involved herein and the provision considered in the *McFadden* case, *supra*, do differ in that the *McFadden* case, *supra*, involved the provision dealing with yarn singles, and the instant case involves the latter portion of said provision dealing with plied yarns. This difference is not a change of language as would vitiate the determination of the common meaning as has been judicially determined in the *McFadden* case, *supra*. We must, therefore, presume that the common meanings of the terms "yarn" and "waste of rayon or synthetic textile," having once been judicially determined, have become a matter of law and so continue until a change of language necessitates a change in the common meaning of these terms.

In the *McFadden* case, *supra*, this court quoted, as follows, from the dictionary, a technical book, and the legislative history:

Webster's New International Dictionary, unabridged (1929), gives the following definition of "yarn":

> yarn, * * * 1. Spun wool; woolen thread; also, thread of other material, as of cotton, flax, hemp, or silk; material spun and prepared for use in weaving, knitting, manufacturing sewing thread, or the like.

Mathews' Textile Fibers, sixth edition, makes the following statement with respect to "yarn":

> A yarn is a generic term, according to A.S.T.M., for "an assemblage of fibers or filaments, either natural or manufactured, twisted or laid together to form a continuous strand suitable for use in weaving, knitting, or otherwise intertwining to form textile fabrics."

Senate Report No. 37, 71st Congress, 1st session was made to accompany H.R. 2667, which subsequently became the Tariff Act of 1930. Under schedule 13, paragraph 1301, the following information is contained:

> As written, the House bill provides in paragraph 1301 for rayon yarns, which term in trade usage means ordinarily filaments which in the process of manufacture are twisted together and are

adaptable for use in textile operations without further conversion. * * *

We then concluded as follows:

In view of the foregoing definitions and information, in order for an article to be a yarn, it must be prepared for or suitable for use in weaving, knitting, or otherwise suitable to form a textile fabric. * * *

It is interesting to note from its legislative history that Congress considered yarns to be such articles as are adaptable for use in textile operations without further conversion. The record herein establishes that the imported merchandise, such as exhibit 1, is utilized without further processing to make lamp fringe, fishlines, knitted netting cores for sash-type woven articles, braided articles, rope, fish netting, wheelbarrow tires, tractor tires, bicycle tires, passenger car tires, and truck tires.

We are of the opinion that, although the merchandise involved herein does have certain defects such as oil spots, overply or underply, or overtwist, it is adaptable for use in textile operations without further conversion. Since the merchandise was classified as yarn and the record establishes affirmatively that the imported merchandise is adaptable for use in textile operations without further conversion, we are of the opinion that it falls within the common meaning of the term, "yarn," and plaintiff has failed to overcome the presumption of correctness attaching to the classification of the collector. Accordingly, the imported merchandise is within the common meaning of the term "yarn" for tariff purposes.

In view of this finding, we deem it unnecessary to review the *Erlanger, Dolliff & McGrath,* and *Alintex* cases, which involve a construction of the term, "waste," as used in paragraph 1302, *supra.* Suffice it to say that, in our opinion, the merchandise is not waste within the meaning of paragraph 1302 of said act, as modified, *supra,* since it has the characteristics of the article which was intended to be produced, namely, yarn. Whether the yarn could be used for automobile tires is not the determining factor. It is a yarn, which falls within the common meaning of the term for tariff purposes.

Since the plaintiff has failed to overcome the presumption of correctness attaching to the classification of the collector and the defendant has affirmatively established that the involved merchandise is a yarn within the intendment of paragraph 1301 of said act, as modified, *supra,* it necessarily follows that, if said merchandise is not a waste of rayon or other synthetic textile under said paragraph 1302 of said act, as modified, *supra,* it is not a waste, not specially provided for, under paragraph 1555 of said act, as modified, *supra.* This naturally follows since waste of rayon or other synthetic textile includes all waste

except such waste as is wholly or in chief value of cellulose acetate. The imported merchandise consists of nylon and is not so composed.

The protest is, therefore, overruled.

Judgment will be entered accordingly.