**CHELTENHAM SUPPLY CORP.**

v.

**UNITED STATES.**

**C.D. 3908; Protest No. 65/9864–94908.**

United States Customs Court,
First Division.

Oct. 27, 1969.

Allerton deC. Tompkins, New York City, for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Morris Braverman, New York City, trial attorney), for defendant.

Before WATSON, MALETZ, and RE, JJ.

RE, Judge:

The plaintiff has brought this action to recover a portion of duties paid upon the importation of certain merchandise

described on the invoice as "transparent cellulose film". It was described in the Special Customs Invoice as "Cellophane in rolls substandard", and was classified under the provisions of item 774.60 of the Tariff Schedules of the United States as other "Articles, not specially provided for, of rubber or plastics", dutiable at 17 per centum ad valorem.

Plaintiff's primary claim is that the merchandise should have been classified as "Waste and scrap, of rubber or plastics, fit only for remanufacture", under item 771.15 of the Tariff Schedules of the United States, with duty at 4 per centum ad valorem. Alternatively, plaintiff claims that the merchandise was properly classifiable under item 793.00 of the Tariff Schedules of the United States, which provides for "Waste and scrap not specially provided for", with a rate of duty at 4 per centum ad valorem.

The following are the pertinent or competing items of the Tariff Schedules of the United States:

"Schedule 7, Part 12, Subpart D:
Articles not specially provided for, of rubber or plastics:

\* \* \* \* \* \* \* \*

774.60 Other ............................... 17% ad val.

Schedule 7, Part 12, Subpart B:
Waste and scrap, of rubber or plastics, fit only for remanufacture:

\* \* \* \* \* \* \* \*

771.15 Other ............................... 4% ad val.

Schedule 7, Part 13, Subpart D:

793.00 Waste and scrap not specially provided for .... 4% ad val."

The merchandise in question was manufactured for use as "anchor coated freezing film", for the packaging of foods which are to be frozen. Because of one or more mechanically or chemically caused defects, it could not be used for the original purpose intended and was sold to the plaintiff as "waste material". The question presented is whether the merchandise is "waste" in the tariff sense of the word, and is classifiable under either of the quoted provisions of the Tariff Schedules of the United States pertaining to "waste".

In addition to the official papers, the record in this case consists of the testimony of one witness called by the plaintiff, and three sample rolls of cellophane film. Although the sample rolls were not from the importation in litigation, they were imported by the plaintiff from the same supplier of the merchandise under protest and illustrated some of the many defects of that merchandise.

Mr. Edward Berger, president and general supervisor of the plaintiff corporation, testified that plaintiff's "basic business is buying waste products and developing them into a saleable and usable product", specializing and dealing "exclusively in all of the various types of cellophane." He testified that plaintiff handled all types of "regenerated cellulose film, commonly known as cellophane", and imported "[i]n excess of two million pounds a year."

Mr. Berger explained that there are fifty or sixty different types of cellophane with variations of weight, coating and thickness, and that it can be produced with certain characteristics which will dedicate it for a particular use. The merchandise covered by the protest was to be used for packaging foods that

were to be frozen. Mr. Berger testified that as a result of various defects it was "thrown out from normal production" and was sold to the plaintiff as waste. Stating that "[t]here are probably 40 different reasons" why the controverted merchandise is "waste material" or "waste", Mr. Berger enumerated some of the specific defects as follows:

"This particular lot of cellophane had anywhere from 20 to 25 different defects in different rolls. Each roll doesn't have all of these defects but each roll has one or more of the defects such as bad color, odor, inability to seal, bad transparency, being cloudy, bad moistureproofness which will allow moisture to transfer through the paper, which is no good, bad rolling, underwound, overcut, many, many splices within one given roll which will not allow it to run on a machine". (R.10–11)

As a consequence of the various defects, Mr. Berger testified that the merchandise could not be used on high speed automatic machinery as originally intended. Additionally, he testified that prior to plaintiff's purchase of the merchandise, the manufacturer disposed of it in the most inexpensive manner: "They burned it, dumped it, and [did] whatever they had to do to just get rid of it."

In customs law the term "waste" is a word of art with a meaning that has been developed by the courts in a series of cases covering a wide variety of merchandise.

After an examination of several definitions, the Supreme Court of the United States has stated that:

"* * * The prominent characteristic running through all these definitions is that of refuse, or material that is not susceptible of being used for the ordinary purposes of manufacture. It does not presuppose that the article is absolutely worthless, but that it is unmerchantable and used for purposes for which merchantable material of the same class is unsuitable."
Patton v. United States, 159 U.S. 500, 503, 16 S.Ct. 89, 90, 40 L.Ed. 233 (1895).

The Supreme Court in the *Patton* case concluded that, "[i]f the ordinary definition of waste, as refuse matter thrown off in the process of manufacture is to control, it is quite clear that the importations in question are not susceptible of this meaning." *Id.* at 505, 16 S.Ct. at 91.

Although the word, more recently, has acquired a more specific and sharper meaning, the essential characteristics set forth by the Supreme Court have continued. For example, the Court of Customs Appeals (now the Court of Customs and Patent Appeals) in the case of United States v. Salomon, 1 Ct.Cust. Appls. 246, 250–251, T.D. 31277 (1911), gave the following description:

"* * * Waste ordinarily implies superfluous, useless or rejected material, something left over, as the refuse of cotton manufacture. Let it not be understood that we mean to hold that Congress has used the word waste in the tariff act as meaning that which has no value—worthless remnants— but that waste is something which is, generally speaking, left over in the treatment of the material, once obtained, as contradistinguished from the treatment to obtain the material itself."

Perhaps the most helpful judicial expression of the tariff meaning of the term is found in Harley Co. v. United States, 14 Ct.Cust.Appls. 112, 115, T.D. 41644 (1926), where the Court of Custom Appeals stated:

"In the tariff sense, waste is a term which includes manufactured articles which have become useless for the original purpose for which they were made and fit only for remanufacture into something else. It also includes refuse, surplus, and useless stuff resulting from manufacture or from manufacturing processes and commercially unfit, without remanufacture, for the purposes for which the original material was suitable and

from which material such refuse, surplus, or unsought residuum was derived. The latter class of waste might be appropriately designated as new waste and includes such things as tangled spun thread, coal dust, broken or spoiled castings fit only for remanufacture."

After quoting the previous statements from the *Harley* case, the Court of Customs and Patent Appeals in United States v. C. J. Tower & Sons, 31 CCPA 185, 187, C.A.D. 271 (1944), noted that "there are two kinds of waste; namely, one, a manufactured article which, because of use or otherwise, has become useless for the purpose for which it was designed and is fit only for remanufacture; and, two, so-called 'new waste,' which is refuse material resulting from a manufacturing process and which is commercially unfit without remanufacture for the purpose for which the original material was suitable." Subsequent cases have adopted and have relied heavily upon the definitions set forth in the *Harley Co.* and *C. J. Tower & Sons* cases. The Midwest Waste Material Co. and E. J. Keller Co., Inc. v. United States, 28 Cust.Ct. 8, C.D. 1382 (1951); Pelton Enterprises, Inc., and Hoyt, Shepston & Sciaroni v. United States, 44 Cust.Ct. 381, Abstract 63935 (1960); D. M. Studner v. United States, 50 Cust.Ct. 149, C.D. 2404 (1963).

As in most legal problems where the rule of law is clear, the difficult question that arises pertains to whether the facts warrant the application of the rule. In the *Pelton* case certain worn-out and obsolete print rollers, in their condition as imported, were incapable of being used as print rollers for printing, stamping or cutting designs. Since the merchandise, by virtue of its condition as imported, was a manufactured article which had become useless for the original purpose for which it was made, and was fit only for remanufacture into something else, the court held that it was dutiable as "waste".

The 1963 *Studner* case also involved print rollers which had become useless for the original purpose for which they were made and fit only for remanufacture into something else. Notwithstanding government counsel's attempt to minimize the force of the *Pelton* case, the court held that the "rationale of the *Pelton* case aptly" applied, and held that the merchandise constituted "waste" in the tariff sense. 50 Cust.Ct. at 156. The record of this 1963 case was incorporated in a second *Studner* case decided by this court on January 27, 1969. Studner v. United States, 62 Cust.Ct. 63, C.D. 3679, 295 F.Supp. 289 (1969). This second *Studner* case involved substantially the same merchandise as the *Pelton* case and the 1963 case, except that the print rollers were straight cut at one end with a jig saw prior to importation, pursuant to the specific instructions of the importer. The court agreed with the holdings in the prior *Studner* case and the *Pelton* case stating that in those cases the "print rollers * * * were waste, as adjudicated, since they were found incomplete and useless for their original purpose and fit only for remanufacture into something else". 62 Cust.Ct. at 67. In the second *Studner* case the court was concerned with the significance of the straight-cutting operation performed prior to importation and held that the article was "advanced in condition for its ultimate use", i.e. as a lamp base. Hence, the court held that "it is deemed partly manufactured and is no longer waste" and overruled the protest. *Id.* at 68, 295 F.Supp. at 294. Judge Ford, in a brief concurring opinion, observed:

"It does seem incongruous that very similar rollers imported by the same plaintiff, in the incorporated case, were sold for basically the same uses and held to be waste. However, unless and until there is evidence to establish that the removal of the one-quarter inch from the roller did not advance it towards its intended use, I would overrule the protest." *Id.* at 70, 295 F.Supp. at 295.

The most recent *Studner* case (Studner et al. v. United States, C.D. 3865,

300 F.Supp. 1394 (1969), appeal pending, which was decided by this court on July 8, 1969, involved an interesting and seemingly novel question. As in the prior cases the merchandise also consisted of "old and used print blocks, incapable of use for its original purpose of printing." The stipulation of facts stated that it was imported "[w]ithout being manipulated in any manner", and "in its imported condition is used and sold as wall decorations." Since the merchandise did not involve or require the element of "remanufacture", the question was presented whether old or used print blocks, incapable of use for their original purpose of printing, but which were sold and used for a new purpose, as wall decorations, were "waste" within the meaning of the tariff act. Clearly, "old waste", that is, old or used articles, no longer suitable for their original purpose and fit only for remanufacture, would be considered "waste" in the tariff sense. The question, therefore, which was regarded by the court as "an unusual one and apparently never squarely presented to the courts", was whether old and used articles no longer suitable for their original purpose had to be "fit only for remanufacture" in order to be classifiable as "waste". The court, in its majority opinion by Chief Judge Rao, stated that, in cases involving "'new waste' it has been held that merchandise which is usable in its imported condition without further manufacture is classifiable as waste. National Carloading Corp. v. United States, 22 Cust.Ct. 328, Abstract 53220 (1949); Cia Algodonera v. United States, 23 CCPA 42, T.D. 47686 (1935); Koons, Wilson & Co. v. United States, 12 Ct.Cust.Appls. 418, T.D. 40589 (1924); W. R. Grace & Co. v. United States, 9 Cust.Ct. 59, C.D. 662 (1942)." 300 F. Supp. at 1397.

Among others, the court referred to the case of National Carloading Corp. v. United States, *supra*, where the merchandise consisted of pieces of sisal fiber which fell off in the process of manufacture, and were unsuitable for use in manufacturing shoes, bags or brushes. In their imported condition they were used as stuffing for furniture and mattresses. In holding that they constituted "waste" the court, in the *National Carloading Corp.* case stated:

"A waste material is not precluded from classification as a waste merely because it may be used in its imported condition without being subjected to further manufacture after it reaches this country. * * *" 22 Cust.Ct. at 329.

Based upon the premise, therefore, that "new waste" did not require fitness for remanufacture, to be waste, the court in the July 8, 1969 *Studner* case held that "old waste" likewise did not require fitness for remanufacture to be waste. The following paragraph captures the reasoning of the majority:

"In the instant case, the print blocks were incapable of use for their original purpose and were 'waste' as far as their use in printing was concerned. They would have been considered 'waste' if another use had been found for them that involved remanufacture. The use to which they are in fact put differs substantially from their original use. 'New waste' is classifiable as waste even though used for a different purpose without further manufacture. It would be illogical to hold that 'old waste', such as this merchandise, has been taken out of the classification, waste, merely because it can be used for another purpose without remanufacture." 300 F.Supp. at 1398.

Additionally, the majority buttressed its opinion by indicating that paragraph 1555 of the Tariff Act of 1930 provided simply for "Waste, not specially provided for". It did not contain the proviso, found in other paragraphs of that act, "fit only to be remanufactured". Hence, the majority concluded that "when Congress intended to limit the terms 'waste' or 'scrap' to merchandise fit only for remanufacture, it so stated." 300 F.Supp. at 1399.

Judge Newman, believing that the decision represented an "unwarranted departure from the common meaning of the term 'waste' as judicially evolved over the years", dissented. He agreed with the position of the defendant therein that "[s]ince the imported merchandise is fit for purposes *other* than remanufacture and is not refuse, it clearly is not waste." [Emphasis in original.] 300 F.Supp. at 1399. Judge Newman did not agree that the "common meaning of the term waste applied by the court in the *Pelton* and prior *Studner* cases [which] was that very meaning pronounced in *Harley* and *Tower* * * * should now be rejected * * *." *Id.*, 300 F.Supp. at 1400. Judge Newman indicated that the rule of these cases, that did not require further manufacture, did not apply since they dealt with "new waste" and the old print blocks were not "new waste". The following paragraph summarizes Judge Newman's dissenting view:

"As long as a manufactured article retains its original characteristics sufficiently so that because of them the article remains a saleable and useful product, without remanufacture, it should not, merely by reason of unfitness for its original use, be relegated to the category of waste. In short, the print blocks had an intrinsic and commercial value, aside from their metal value, and were not waste or sold as such." *Id.*, 300 F.Supp. at 1402.

Judge Newman's views ought to be read together with the following statements from the *Harley Co.* case. Referring to the words "junk, old" as found in earlier tariff acts, the court said:

"* * * That designation meant a manufactured article rendered unsuitable for the purpose for which it was originally made, which thereby became fit only for remanufacture and had no value other than that of a manufacturing material. Of course, if a manufactured article is reasonably fit for the purpose for which it was originally intended and is practi-

cally available for such use, or has a value in addition to that of a mere material, it is not old junk. So wearing apparel which is still reasonably available for use as wearing apparel, or which may be repaired without undue expense and devoted to its original purpose, or which, without remanufacture, has a valuable practical use, is not waste or old junk." 14 Ct. Cust.Appls. at 115.

Although the case at bar may be decided by an adherence to the traditional or classic definitions of the term "waste", the most recent *Studner* case nevertheless serves the purpose of manifesting a judicial attitude of liberalization in expanding upon the older definitions. The record of the case at bar will therefore be examined to determine whether the facts bring the case within the confines of those definitions.

There can be little doubt that the July 8, 1969 decision of this court in the *Studner* case extended the definition of waste by removing the requirement of remanufacture for "old waste". The cases cited therein had previously removed the requirement of remanufacture for "new waste." These extensions of the traditional definitions of "waste", however, are not required to decide the case presently before the court. The record amply demonstrates that the controverted merchandise, because of certain defects, had become useless for the original purpose for which it was made. Although it was made for use as transparent packaging for frozen foods, such as bread or steaks, the evidence is overwhelming that it could not be used on highspeed machines and was not usable for the original purpose for which it was manufactured.

Plaintiff's witness referred to the merchandise as "reject and waste material", and prior to its purchase by the plaintiff the manufacturer disposed of it in the most inexpensive manner, by burning or dumping.

It is true that the uselessness did not stem from the age or use of the mer-

chandise but rather from defects caused during the process of manufacture. Were the merchandise to have been "refuse, surplus and useless stuff resulting from manufacture", clearly it would qualify as "new waste". The case however deals with merchandise that is so defective that it itself is a "refuse" useless for the original purpose for which it was manufactured. As a practical matter such merchandise is no different from the "refuse, surplus, or unsought residuum" which is unquestionably "new waste".

Although the basic judicial definitions of waste quoted herein have not specified the element of defectiveness of the articles, it is to be observed that dictionary definitions of waste do include material that is "defective". For example, Webster's Third New International Dictionary of the English Language Unabridged (1968) gives the following as a definition of waste:

"4 a: damaged, defective, or superfluous material produced during or left over from a manufacturing process or industrial operation: material not usable for the ordinary or main purpose of manufacture * * *"

█ It would seem incongruous and illogical to say that the refuse or scrap of the manufacturing process constitutes waste, and not the product itself if it is so damaged or defective as to be unfit for use for the original purpose for which it was made. In either event it ought to be classified as "waste", within the definition set forth in the *Harley Co.* case, if it is "fit only for remanufacture". Analogous to the "scrap iron" in Schlesinger v. Beard, 120 U.S. 264, 267, 7 S.Ct. 546, 30 L.Ed. 656 (1887), the merchandise herein, by virtue of its defects or defective condition, had been "thrown away, or, in the language of the trade, 'into the scrap heap' " since it was not "capable of any use until remanufactured".

Although, in its brief, the defendant attempts to deny or minimize plaintiff's process in the "remanufacture" of the merchandise, plaintiff's witness described in detail the process of "regeneration" whereby the merchandise was made into a usable product. Depending upon the particular defect, the merchandise is processed for a new use, essentially for wrapping or packaging, although some is shredded for use in Easter baskets. The defendant is not impressed by the fact that the uses of the reprocessed material differ from the original use, and that the plaintiff has given the merchandise a new and different name. The new purposes for which the reprocessed material is used includes the wrapping of wall plates and metal products, such as screws, in addition to the "twist wrapping" of candy on low speed machines. The defendant therefore asserts that "[f]urther evidence of the fact that the imported rolls of cellophane tape in various widths were not waste is the fact that they were suitable for and actually used for the purpose for which cellophane tape is traditionally and commonly used, i.e., in the packaging trade." (Defendant's brief p. 7) This assertion, of course, completely ignores the testimony that the merchandise was "obtained from throw outs of normal production", the specific defects of the merchandise, and that the manufacturer got rid of it prior to its purchase by the plaintiff. Additionally, it is only after the plaintiff's processing procedure, which was detailed by Mr. Berger, that it became usable or useful. It cannot be denied that it was not suitable for use for the original purpose for which it was manufactured, i.e., the packaging of foods which are to be frozen. There is not a scintilla of evidence in the record that shows that the merchandise had any use whatever prior to its remanufacture by plaintiff. On the contrary, the evidence is clear that it was discarded and disposed of by burning or dumping. Although it may be true that the use is basically "packaging" there is a vast difference between the original intended use and the ones for which it has been "regenerated" by the plaintiff. See Rachman Bag Co.,

Inc. v. United States, 57 Cust.Ct. 465, 469, C.D. 2838 (1966); P. Silverman & Son v. United States, 27 CCPA 324, C. A.D. 107 (1940). The vast difference from the original intended purpose cannot be denied. As stated by this court in the July 8, 1969 *Studner* case:

> "* * * The use to which they [print blocks] are in fact put differs substantially from their original use. 'New waste' is classifiable as waste even though used for a different purpose without further manufacture." 300 F.Supp. at 1398.

It is to be noted that the words in the *Harley Co.* case "fit only for remanufacture into something else" pertain to the definition of "old waste", and that the definition of "new waste" contains only the words "without remanufacture" and "fit only for remanufacture." Defendant is apparently of the belief that the remanufacture must necessarily result in a wholly new and different product. The definition in the *C. J. Tower & Sons* case, which developed the definition in the *Harley Co.* case, speaks only of the article becoming useless for the purpose for which it was designed and "is fit only for remanufacture". The important requirement in all the definitions is the element of being "commercially unfit, without remanufacture". Clearly, the merchandise at bar falls within this portion of the definitions of "waste".

The defendant relies upon and quotes extensively from the 1966 case of C. J. Tower & Sons of Buffalo, Inc. v. United States, 56 Cust.Ct. 274, C.D. 2638 (1966), wherein plied nylon yarn, because of certain defects, was claimed to be "waste". The defects consisted of oil spots, overply, drop or underply, undertwist or overtwist. The merchandise had been classified as "Yarns of rayon" under paragraph 1301 of the Tariff Act of 1930. Plaintiff claimed that it was "Waste of rayon" within paragraph 1302. By oral amendment the plaintiff alternatively claimed the merchandise to be classifiable as "Waste, not specially provided for", under paragraph 1555 of

that act. The question presented in that case was whether the merchandise was "yarn" within the applicable paragraph of the Tariff Act of 1930, or whether "by reason of the stated imperfections has lost its character as 'yarn' and becomes 'waste'". *Id.* at 281. Citing appropriate judicial authority the court stated two related well settled applicable principles of law. First, "[i]n the absence of a showing of a commercial designation which differs from the common meaning, the latter controls." Second, "* * * the common meaning of a term once judicially determined will be presumed to continue in use until the statutory language is changed by subsequent legislation." *Ibid.* Having found that the common meanings of both "yarn" and "waste of rayon" within the pertinent paragraphs of the tariff act had been judicially determined, the court held that the testimony therein, with respect to the character and susceptibility for use of the merchandise, brought it within the common meaning of the term "yarn". In holding that the merchandise was therefore not "waste", the court stated:

> "We are of the opinion that, although the merchandise involved herein does have certain defects such as oil spots, overply or underply, or overtwist, it is adaptable for use in textile operations without further conversion. Since the merchandise was classified as yarn and the record establishes affirmatively that the imported merchandise is adaptable for use in textile operations without further conversion, we are of the opinion that it falls within the common meaning of the term 'yarn,' and plaintiff has failed to overcome the presumption of correctness attaching to the classification of the collector. Accordingly, the imported merchandise is within the common meaning of the term 'yarn' for tariff purposes." *Id.* at 283.

The *C. J. Tower & Sons of Buffalo, Inc.* case offers an example of the rule found in the *Harley Co.* case that if a manufactured article "has a value in ad-

dition to that of a mere material, it is not old junk." 14 Ct.Cust.Appls. at 115. The example given in the *Harley Co.* case was wearing apparel which "without remanufacture, has a valuable practical use". *Ibid.*

The case presently before the court for decision is factually clearly distinguishable from the *C. J. Tower & Sons of Buffalo, Inc.* case. Although the yarn in the *C. J. Tower & Sons of Buffalo, Inc.* case could not be used for automobile tires, as originally intended, the testimony reflected a variety of valuable and practical uses for which it was suitable. Although of a low grade it was nevertheless "yarn" "adaptable for use in textile operations without further conversion." In the case at bar "every pound" of the merchandise had to be reprocessed in order to make it a usable product, and the remanufacturing process cost the plaintiff a minimum of 100 percent of the base cost. The discrepancy or difference in value is also a significant point of distinction. The difference in value between yarn without defects, and the defective yarn in the *C. J. Tower & Sons of Buffalo, Inc.* case was 3½ to 1, i. e., 30 cents for the defective yarn and one dollar for new yarn. In the case at bar the manufacturer sold the merchandise in question to the plaintiff for only 5 cents a pound whereas cellophane usable for the original intended purpose sells for 81 cents a pound in the United States and for 93 cents a pound in Canada, the country of origin.

The merchandise herein is therefore "waste" in the tariff sense since the evidence demonstrates clearly that it was a manufactured article that because of certain specific defects, was rendered useless for the original purpose for which it was made, and was fit only for remanufacture.

■ Since the merchandise under protest is "waste" within the definitions hereinbefore quoted, it was improperly classified as "articles not specially provided for, of rubber or plastics". The record of this case reveals clearly that the merchandise in question comes within item 771.15 of the Tariff Schedules of the United States which covers *specifically* "Waste and scrap, of rubber or plastics, fit only for remanufacture". It is therefore to be classified under a specific rather than a general provision pertaining to waste in the TSUS. General Interpretative Rule 10(c). See United States v. Rotberg & Krieger, 24 CCPA 441, 448, T.D. 48902 (1937).

Were there to have been no "remanufacture" in the case at bar, the court would have been required to pass upon plaintiff's alternative claim that the merchandise is "Waste and scrap not specially provided for" under item 793.00 of the Tariff Schedules of the United States. It will be noted that item 793.00 does not contain the proviso "fit only for remanufacture". Under those circumstances the court would again be confronted with the problem which was resolved in the most recent *Studner* case where old print blocks were classified as waste even though the element of "remanufacture" was lacking.

■ In view of the foregoing the presumption of correctness of the collector's classification has been sufficiently rebutted and the plaintiff has demonstrated that the controverted merchandise is properly classifiable as "Waste and scrap, of rubber or plastics, fit only for remanufacture" under item 771.15 of the Tariff Schedules of the United States. Judgment will issue accordingly.