(C.D. 4343)

BARNEBEY-CHENEY CO. *v.* UNITED STATES

United States Customs Court, First Division

(Decided March 17, 1972)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*L. Patrick Gray III*, Assistant Attorney General (*Glenn E. Harris*, trial attorney), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This case concerns the dutiable status of an importation from Great Britain that was described on the invoices as "scrap charcoal from gasmasks." The government assessed the charcoal with duty at the rate of 19 percent under paragraph 69 of the Tariff Act of 1930, as modified by T.D. 54108, as a gas-absorbing char.[1] Plaintiff claims the imported charcoal is "waste" and that it therefore should be assessed as such at the rate of 4 percent under paragraph 1555, as modified by T.D. 52739.[2] Alternatively, plaintiff contends that the merchandise consists of wood charcoal and therefore comes within the purview of paragraph 1802 of the 1930 Tariff Act which allows such charcoal to be imported duty-free.

It is of course basic that in a tariff classification case the plaintiff has the twofold burden of proving that the government's classification is erroneous and that its own claimed classification is correct. On this latter aspect, it was thus part of plaintiff's burden to establish that the imported charcoal was "waste" within the meaning of paragraph 1555 or "wood charcoal" within the purview of paragraph 1802. It is against this background that we now turn to the record to determine whether plaintiff has established either of its affirmative claims.

The facts are these. Sometime in 1958, the British Government tendered for sale, as surplus, approximately 14,000 tons of gas masks manufactured between the years 1936 and 1945. In tendering these masks, the British Government noted that they were unsuitable as protection against any other than war gases and cautioned that the "[c]harcoal which may be recovered from the breakdown of the * * *

---

[1] Paragraph 69, as thus modified, covers, among other things, "[d]ecolorizing, deodorizing, or gas-absorbing chars and carbons, whether or not activated, and all activated chars and carbons _ _ _ _ 19% ad val."

[2] Paragraph 1555, as thus modified, covers "[w]aste, not specially provided for _ _ _ _ 4% ad val."

[gas masks] may not be used for the preservation of foodstuffs or the purification of water."

Pursuant to this tender, the firm of J. & J. Maybank, Ltd. (Maybank) purchased all the gas-mask containers and then invented a machine to open the charcoal containers and release the charcoal they contained. Maybank, in turn, sold all such charcoal to the plaintiff. At issue in the present case are four of the numerous entries of the charcoal that were made by the plaintiff as a result of this purchase from Maybank.

Certain characteristics of the gas-mask charcoal are established by the record. Thus, according to the testimony via a commission of James Charles Maybank, the charcoal in some containers was derived entirely from coconut shells; in other containers, from a mixture of coconut shells and coal; and in still others, from coal carbon. Hence the record does not show whether the four entries involved here consist solely of coconut shells, solely of coal carbon, or a mixture of the two types.

The charcoal was originally impregnated with various metallic salts of copper, silver and chromium. In addition, as the cannisters were cut open, the charcoal therein was passed through a screen into burlap sacks for storage and shipment. However, it appears that small slivers of metal and bits of fabric from the cannisters also came through the screen and were thus contained in the imported charcoal. Further, by the time plaintiff received the charcoal, it contained about 20 percent moisture.[3]

The basic principle of activated charcoal is the phenomenon of "adsorption" whereby molecules of a gas or liquid are held to the "surface" of the charcoal by certain bonds of attraction—which are sometimes referred to as "surface forces of attraction" or "Van der Waal's forces of attraction." "Surface" in this sense has a special meaning—it refers not only to the outside "surface" of the charcoal granules, but also the interior "surface" which exists inside the granules in the form of a myriad of pores which may be entered by gas and liquid molecules. In short, in adsorption the gas or liquid molecules are held to the charcoal by surface forces of attraction; they do not combine chemically with the charcoal as in the case of "chemisorption."[4] The pores in activated charcoal which create the adsorp-

[3] In answer to an interrogatory, Maybank testified that in many cases Civil Defense workers, as part of their training, used the masks in a gas chamber. He added that some masks—although he did not know how many—were contaminated with different poisonous gases. However, this latter statement that some of the charcoal contained "poisonous gases" is otherwise devoid of any support in the voluminous record in this case.

[4] In the process of chemisorption, a molecule is taken into an adsorbent, such as activated charcoal, and reacts chemically with either the surface of the charcoal or a surface complex and is held there by chemical bonds which are stronger than pure adsorptive bonds.

tive surface range in size and the size of the pore openings correlate with their prospective uses as a gas-adsorbing or liquid-adsorbing activated charcoal. In this connection, activated charcoal in order to be effective in the adsorption of liquid molecules, must possess pores of relatively larger opening diameters than gas-adsorbing activated charcoal since liquid molecules tend to be larger than gas molecules. Thus, liquid-adsorbing activated charcoal must contain pores with opening diameters generally in excess of 40 angstroms (an angstrom is one hundred-millionth of a centimeter), while gas-adsorbing activated charcoal contains pores with opening diameters generally in the range of 10 to 40 angstroms.

When activated carbon has adsorbed a gas or liquid to its full potential, it then has no further adsorptive capacity; when it has adsorbed some gas or liquid molecules but may adsorb still more, it has some residual adsorptive capacity. The potential adsorptive capacity of an activated charcoal is, however, relative to the particular molecules which may be adsorbed, for relatively heavier molecules may be adsorbed within the pores of activated charcoal by driving off (or "desorbing") relatively lighter molecules, such as water. Aside from the phenomenon of desorption and the influence which pore opening sizes may have, the total potential adsorptive capacity of an activated charcoal is dependent upon the total external and internal surface which has been created in the process of activation. When an activated charcoal has adsorbed its full potential of a gas or liquid, or practically so, it is termed a "spent" carbon.[5]

It is to be noted that a particular activated charcoal may, because of its distribution of pore opening sizes, adsorb both gases and liquids. Also in a technical sense, charcoal will *ab*sorb a small amount of liquids and gases;[6] however, when activated, the charcoal will *ad*sorb them. Indeed, when activated charcoal is exposed to the atmosphere, it will adsorb whatever gases are in that atmosphere save for any gas it has previously adsorbed to the limit of its capacity. Further, adsorption by an activated charcoal to its full potential is only a temporary state in view of the fact that the charcoal can be reactivated simply by heating the charcoal to 100 or 150 degrees centigrade and blowing air through it. This removes the adsorbed vapors from the charcoal and restores it essentially to its original activated condition.

Activated charcoal is created first by carbonizing wood, lignite or soft coal and then subjecting the resulting unactated charcoal to a high temperature of about 900 degrees centigrade in the presence of steam. The water vapor at that temperature burns out the hydro-

[5] Even with "spent" carbon, a substance with a higher molecular weight than moisture can replace some of the moisture contained in the carbon and be adsorbed.

[6] Absorption is a phenomenon akin to a sponge taking up water.

carbons that are present on the outside and inside of the carbon granules and thus reams out fine pores in the charcoal structure in which adsorption takes place. Before activation, the charcoal has no internal pore structure. Activation results in the development of an inner pore structure, usually with an approximate 63 percent loss in weight and a commensurate decrease in the density of the carbon. Carbonized material is kept under high temperature for a longer period of time if the objective is to create larger pores for decolorizing liquids rather than smaller pores for gas-adsorbing purposes.

Activation, it is to be observed, is an irreversible process—once the internal pore structure is created, it remains, presumably until the granule gradually breaks down; on the other hand, adsorption of liquid or gas molecules, while temporarily filling the pores, does not destroy them.

Activated charcoal has a unique property—when "spent" (i.e., when its immediate adsorptive capacity has been lost through the adsorption of liquid or gas molecules), it is capable of "regeneration," "rejuvenation," or "revivification." Thus, its adsorptive capacity may be restored almost to its original level simply by the application of heat to drive off the adsorbed gas or liquid molecules. In this connection, many industries use activated charcoal in air-purification applications in which the charcoal is automatically "recycled"; i.e., automatically subjected to a heat-treatment process which drives off adsorbed vapors and then again exposed to the air which is to be purified. As one of defendant's witnesses put it: "Spent activated carbon is a temporary state of saturation of the activated carbon with adsorbed vapors, and can be reversed by * * * heating the carbon up to 100 or 150 degrees centigrade, and blowing dry air through it, and then you can remove the adsorbed vapors from the carbon, and essentially restore it to its original activity." (R. 499)

It is clear that the imported merchandise here in issue was an activated charcoal when it was first used in the manufacture of gas masks. It is also clear that upon entry it had a sufficiently high adsorbed moisture content, i.e., 20 percent, to be regarded as a "spent" activated charcoal which, in addition, contained slivers of metal and fabric and metallic salts. There is no evidence of any tests plaintiff subjected the merchandise to upon entry; to the contrary, the only test on the merchandise was performed by the government using benzene vapors. That test, it is to be noted, was a static test—which did not attempt to determine either the rate at which the charcoal in question could absorb any gas or the relative efficiency of its adsorptive capacity. The test was conducted in the following manner: The Customs chemist, who had been previously advised by an expert in charge of research work on air filtration for the military, took two grams of the imported

merchandise that was furnished by plaintiff, dried it in an oven for one hour at 105 degrees centigrade, weighed it, placed it overnight in a desiccator which contained an atmosphere of benzene, reweighed it the following morning, and determined that it had adsorbed benzene amounting to 20 to 30 percent of the weight of the charcoal used in the test. According to defendant's expert who had suggested the test, this degree of adsorption of benzene showed that the carbon had a fairly substantial adsorptive capacity and thus was an "activated" carbon.

Plaintiff claims that the imported charcoal was used as a "raw material" for the production of activated carbon and was "activated" at high temperature under steam to "burn out" the adsorbed material. Whatever the treatment it may have been subjected to, some of the imported merchandise was resold by plaintiff as a gas-phase adsorbent and other portions processed into a liquid-phase adsorbent. For all practical purposes, therefore, the imported merchandise originated as a gas-adsorbent activated charcoal and a good deal of it was eventually sold by plaintiff as a gas-adsorbent activated charcoal. In the main, plaintiff did not try to drive off the metallic salts which were contained in the activated charcoal, although a minor part of the carbon was subsequently leached to remove the metallic salts.

In this setting, we come now to the question as to whether or not the imported charcoal was a "waste." It is quite true that when the British Government tendered the gas masks for sale as surplus, they might well have been considered "waste." That, however, is not the question before the court. The question, rather, is whether the charcoal reclaimed from those masks and later imported into this country as a separate and distinct product was a "waste."

The classic definition of "waste" is found in *Harley Co.* v. *United States*, 14 Ct. Cust. Appls. 112, 115, T.D. 41644 (1926) :

> In the tariff sense, waste is a term which includes manufactured articles which have become useless for the original purpose for which they were made and fit only for remanufacture into something else. It also includes refuse, surplus, and useless stuff resulting from manufacture or from manufacturing processes and commercially unfit, without remanufacture, for the purposes for which the original material was suitable and from which material such refuse, surplus, or unsought residuum was derived. The latter class of waste might be appropriately designated as new waste and includes such things as tangled spun thread, coal dust, broken or spoiled castings fit only for remanufacture. * * *

See also e.g., *Cheltenham Supply Corp.* v. *United States*, 63 Cust. Ct. 271, C.D. 3908, 306 F. Supp. 472 (1969).

Obviously, the imported merchandise is not "new waste." If it is "waste" of any kind, it must fit under that part of the foregoing

judicial definition which covers "manufactured articles which have become useless for the original purpose for which they were made and fit only for remanufacture into something else." The imported merchandise in no sense fits the above definition. In the first place, the nature of the merchandise before the court was concisely expressed by plaintiff's principal witness as "spent, impregnated activated charcoal." [7] It was "spent" principally because of the unusual amount of moisture it had adsorbed.

The record shows that the test performed by the Customs chemist on samples furnished by plaintiff was not a standard test. However, the record leaves no doubt that its results were valid in determining the presence of sufficient adsorptive capacity to render the test samples "activated." Nor (as we have seen) is there any indication in the record that any tests were performed by plaintiff. Hence, defendant's test results are the only ones by which the adsorptive characteristics of the imported merchandise are known.

This brings us to the basic issue as to whether plaintiff has proven that the imported charcoal was a "waste." We think not. For the imported merchandise was not manufactured into "something else"—it came in as (spent) activated charcoal and was later resold as (unspent) activated charcoal. Relevant in this circumstance is *Supreme Tire & Rubber Co.* v. *United States*, 7 Cust. Ct. 193, C.D. 566 (1941), where used automobile tires were in issue. They had been classified under the *eo nomine* provision for automobile tires in paragraph 1537(b) of the Tariff Act of 1930. Plaintiff claimed *inter alia* that they were properly classifiable as waste under paragraph 1555 of that act. The court overruled the protest and sustained the classification, and in so doing remarked (7 Cust. Ct. at 196):

> * * * It is clear from the record that the articles as imported were fit not only for the purpose of remanufacture as a rubber material but also for repair, by retreading or vulcanization, as rubber automobile tires. Their identity as tires never was lost and their commercial use and value lay not merely in the rubber that might be reclaimed from them but in the fact that they might be the foundation upon which a new tread might be built, or the existing tread vulcanized, in either case so that the original tire might be used again and serve the same purposes for which it was originally made. It may be true that they might not be lawfully used as tires in certain states in the condition as imported by reason of the fact that they would be a source of danger on the highway, but the fact remains that whether good, bad, or indifferent they were automobile tires, having a definite value as such.

---

[7] Plaintiff's witness indicated that the presence of metallic salts in the imported charcoal would not be harmful in using the merchandise as a gas-adsorbent activated carbon. He also indicated that the small pieces or slivers of metal and fabric in the merchandise were removed by screening—which reduced the yield of useful material that could be obtained from the charcoal.

By the same token, spent activated charcoal, requiring regeneration to restore its immediate adsorptive capacity, is no more a "waste" than are used automobile tires that require retreading or vulcanization to restore them to full vitality.[8] Nor, it may be added, is the import any more of a "waste" than a battery that has partially run down but still can be recharged to operate successfully.

Lastly, we turn to plaintiff's alternative claim that the imported merchandise is "wood charcoal" within the meaning of paragraph 1802 of the Tariff Act of 1930 and therefore duty-free. On this aspect, it is to be observed that charcoal made from coconut shells has been held to be "wood charcoal" under paragraph 1802. *Holland Columbo Trading Society, Inc.* v. *United States*, 34 Cust. Ct. 90, C.D. 1684 (1955). Leaving aside the question as to whether paragraph 1802 is less or more specific than paragraph 69, plaintiff's claim under paragraph 1802 must fail for want of proof since plaintiff has not shown that the entries of charcoal here in issue consisted solely of coconut shells, solely of coal carbon, or a mixture of the two types.

The protests are overruled. Judgment will be entered accordingly.

(C.D. 4344)

_____

[8] To the extent that plaintiff not only regenerated the gas-adsorbent carbon but enlarged the pore sizes to make it suitable as a liquid-phase adsorbent, it performed a task which was clearly superfluous for the purpose of this case. Simple regeneration would have sufficed to restore the immediate adsorptive capacity of the carbon as a gas-phase adsorbent. It must be borne in mind in this connection that activated carbon used in gas masks, according to uncontradicted testimony in the record, "protects against a very wide spectrum" and is "essentially non-selective in adsorption." The metallic salts were added to give "even greater protection against specific agents," by chemisorption. As we have already pointed out, those metallic salts were not deleterious to gas-adsorption applications.