(C.D. 4265)

E. J. Littman Company *v.* United States

United States Customs Court, First Division

(Decided September 13, 1971)

*Harris, Sacks, Subrin, Goldman, Penner & Stein* (*Ronald L. Penner* of counsel) for the plaintiff.

*L. Patrick Gray, III,* Assistant Attorney General (*Velta A. Melnbrencis,* trial attorney), for the defendant.

Before WATSON, MALETZ and RE, Judges

WATSON, Judge: This protest places in issue the classification of polystyrene, invoiced as "mixed coloured reground polystyrene scrap and sweepings". The importation was classified pursuant to item 405.25 of the Tariff Schedules of the United States as "plastics materials" and assessed with duty at the rate of 18 per centum ad valorem and 2.8 cents per pound. Plaintiff claims it should properly be classified pursuant to item 771.15 of said tariff schedules as other "waste and scrap, of rubber or plastics, fit only for remanufacture" and dutiable at the rate of 4 per centum ad valorem.

The relevent statutory provisions read as follows:

Tariff Schedules of the United States:

Schedule 4, Part 1:

SUBPART B. INDUSTRIAL ORGANIC CHEMICALS

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

| | | |
|---|---|---|
| 403.10 | Styrene _____ | 2.8¢ per lb. +18% ad val. |

Subpart C headnotes:

1. The provisions of this subpart providing for products obtained, derived, or manufactured in whole or in part from products described in subparts A or B of this part shall also apply to products of like chemical composition having a benzenoid, quinoid, or modified benzenoid structure artificially produced by synthesis, whether or not obtained, derived, or manufactured in whole or in part from products described in the said subpart A or B.

| | | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |

3. The term "plastics materials" in item 405.25 embraces products formed by the condensation, polymerization, or copolymerization of organic chemicals and to which plasticizers, fillers, colors, or extenders may have been added. The term includes, but is not

limited to, phenolic and other tar-acid resins, styrene resins, alkyd and polyester resins based on phthalic anhydride, coumarone-indene resins, urethane, epoxy, toluene sulfonamide, maleic, fumaric, aniline, and polyamide resins, and other synthetic resins. The plastic materials may be in solid, semi-solid, or liquid condition, such as flakes, powders, pellets, granules, solutions, emulsions, and other basic forms not further processed.

Classified under

> Products obtained, derived, or manufactured in whole or in part from any product provided for in subpart A or B of this part:
>
> \* \* \* \* \* \* \*

405.25 Plastics materials_____ 2.8¢ per lb. +18% ad val.

Schedule 7, Part 12:

SUBPART B. RUBBER AND PLASTICS WASTE AND SCRAP; RUBBER AND PLASTICS FILM, STRIPS, SHEETS, PLATES, SLABS, BLOCK, FILAMENTS, RODS, TUBING AND OTHER PROFILE SHAPES

Subpart B headnotes:

> \* \* \* \* \* \* \*
>
> 3. The provisions in this subpart applicable to waste and scrap of rubber or plastics do not apply to waste and rags of man-made fibers (see schedule 3) or to any waste or scrap which has been cleaned, ground, melted, made into pellets, or otherwise processed.

Claimed under

> Waste and scrap, of rubber or plastics, fit only for remanufacture:
>
> \* \* \* \* \* \* \*

771.15 Other _____ 4% ad val.

The record in this case consists of the official papers; the testimony of Messrs. Charles S. Geiger, Sr. and Wayne F. Nelson, for the plaintiff and the testimony of Messrs. Anthony Urbas, Donald Seidwand and Irving Sporn, for the defendant, as well as plaintiff's exhibits 1 to 14 and defendant's exhibits A and B.

It appears from the testimony that the merchandise in question was imported for the account of A. Schulman, Inc. of Akron, Ohio, a leading compounder of plastics materials. The merchandise proved unsatisfactory for the purposes of Carlon Products Co., a customer of A. Schulman, Inc., and the importation was ultimately utilized entirely by the Schulman company as an ingredient in the amount of 5 to 10 percent in the production of a molding grade, medium impact, utility grade color plastic compound.

Mr. Nelson, A. Schulman, Inc.'s director of research, discussed plastic materials in terms of "prime" or "virgin" material and "off-spec" and "scrap" material. He referred to scrap as a material that had to be cross-blended or cleaned up before it could be used in the production of plastic. This is due to the fact that it contains a mixture of viscosities and can also contain floor sweepings, dirt, metal, wood, etc.

Mr. Nelson testified that the importation is usually generated as "outfall" at a producer's plant in large pieces which are normally then guillotined, ground, packaged and offered for sale subject to examination. He stated that in this case there was more than a normal amount of foreign material contamination present requiring it to be blended in the amount of 5 to 10 percent with other plastic material.

Mr. Urbas, employed as a sampler by the U.S. Bureau of Customs, testified that he drew three samples from three different containers of the importation and gave them to Mr. Seidwand. Portions of these samples were sent by Mr. Seidwand to the Customs Laboratory in Philadelphia together with six additional cans supplied by the Schulman company and said to contain further samples of the instant merchandise. Mr. Sporn, the assistant chief chemist at the Customs Laboratory at Philadelphia, performed an analysis of the samples and concluded that the material sent in consisted of polystyrene type resin with no evidence of any other resins present.

Defendant's exhibit A consists of his report concerning the samples obtained by Mr. Urbas and defendant's exhibit B consists of his report dealing with the six samples supplied by the Schulman company.

Plaintiff's exhibits 1 to 12 consist of various samples of the instant merchandise introduced solely for the purpose of representing their color and variation.

Plaintiff relies heavily on the testimony by Mr. Nelson that the material in issue was regarded by him and others of similar knowledge and experience in the field, as "scrap". Plaintiff also emphasizes that the importation could be used only as a 5 to 10 percent component of a blended mixture and could not be used by itself to produce a plastic product. Although we have a high regard for the expertise of plaintiff's witness, and his familiarity with the usage of the trade in this matter, we find that with regard to the definition of the term "scrap", the tariff headnotes and legislative history together with the relevant case law, lead to the conclusion that the instant importation does not consist of "scrap".

The instant importation must be excluded from the scope of the term "scrap" for a number of reasons, any one of which would be disqualifying. Headnote 3 to subpart B of schedule 7, part 12, provides that the provisions for waste and scrap of rubber or plastics do not apply to "any waste or scrap which has been cleaned, ground, melted,

made into pellets, or otherwise processed." It is clear from the testimony that the importation herein has been ground in the course of its preparation for export and, hence, is explicitly excluded from the coverage of item 771.15.

Even were the importation not excluded from the scope of scrap by reason of having been ground prior to its exportation, we would still not consider it to be scrap, inasmuch as it is not "fit only for remanufacture". It is our considered opinion that the method by which this importation was ultimately utilized, that is to say, by blending with virgin material, is not a process of remanufacture. It is indistinguishable from the process by which prime or virgin material is utilized save for the proportions involved and the necessity for pre-blending. The blending is not a process which is done to transform the merchandise into a useful state but is really done to facilitate its use for its original purpose. Hence, the substance which is subjected to blending is not a scrap.

In this connection we find the facts herein analogous to those in *C. J. Tower & Sons of Buffalo, Inc.* v. *United States*, 56 Cust. Ct. 274, C.D. 2638 (1966), wherein certain defective nylon yarn was claimed to be "waste" pursuant to paragraph 1302 or 1555 of the Tariff Act of 1930 rather than "yarns of rayon" pursuant to paragraph 1301 of said act. The court found that the defective yarn came within the common meaning of the term "yarn" and stated as follows:

> We are of the opinion that, although the merchandise involved herein does have certain defects such as oil spots, overply or underply or overtwist, it is adaptable for use in textile operations, without further conversion. Since the merchandise was classified as yarn and the record establishes affirmatively that the imported merchandise is adaptable for use in textile operations without further conversion, we are of the opinion that it falls within the common meaning of the term "yarn," and plaintiff has failed to overcome the presumption of correctness attaching to the classification of the collector. Accordingly, the imported merchandise is within the common meaning of the term "yarn" for tariff purposes.

We distinguish the case of *Cheltenham Supply Corp.* v. *United States*, 63 Cust. Ct. 271, C.D. 3908, 306 F. Supp. 472 (1969). In that case certain importations of cellophane were found to be properly classifiable as waste and scrap, of rubber or plastics, fit only for remanufacture pursuant to item 771.15 rather than as articles not specially provided for of rubber or plastics, pursuant to item 774.60 of said tariff schedules. There, however, the importation was found to require a definite process of remanufacture before it could be used; a process we consider entirely distinct from the mere diminution in quantity used which took place herein. The blending herein is not a process sufficiently directed to the transformation of the importation as to

constitute remanufacture. It follows from this that since the importation herein was used as a plastics material without the necessity of undergoing remanufacture, it is not a "waste". On this point the facts herein again differ from those in *Cheltenham Supply Corp.* v. *United States, supra,* where the importation, although used for a purpose resembling that for which it could have been used in its prime state, was so used only after remanufacture.

In its imported condition and in its use, the importation meets the definition of the term "plastics materials" as defined in headnote 3 of subpart C to schedule 4, part 1, *supra.* We take particular note of the comment in the Tariff Classification Study explanatory notes for schedule 7, part 12, subpart B at page 450 which read as follows concerning the tariff treatment of plastic waste:

> Headnote 3 is concerned with the tariff treatment of plastic and rubber waste and scrap. Certain plastic materials are capable of being recycled and, when recovered in the form of waste and scrap, can be directly reintroduced into molding or other processes by themselves or with virgin material, particularly if such waste or scrap has been advanced by cleaning, grinding or other process. Such advanced plastic waste or scrap would not be within the provisions of this subpart, but would be dutiable with the virgin plastics materials in the chemical schedule.

For the above reasons, we feel that the instant importation is clearly excluded from the scope of plastic scrap fit only for remanufacture and was properly classified pursuant to the provision for plastics materials.

Judgment will issue accordingly.